### GUY OWENS *v.* NEW BRITAIN GENERAL HOSPITAL (14840)

BORDEN, BERDON, KATZ, F. FREEDMAN and F. X. HENNESSY, Js.

Argued March 22—decision released June 14, 1994

*Barbara L. Cox,* with whom were *William F. Gallagher* and, on the brief, *Dennis N. Garvey,* for the appellant (plaintiff).

*Theodore J. Tucci,* with whom was *Linda L. Morkan,* for the appellee (defendant).

KATZ, J. This appeal requires us to establish the proper test for determining whether a hospital sufficiently complied with its medical staff bylaw obligations for the purpose of terminating a physician's medical staff privileges. We conclude that the substantial compliance test is the proper standard by which to review the hospital's compliance with the bylaws, and therefore affirm the judgment of the Appellate Court.

The following undisputed facts are relevant to this appeal. The plaintiff, Guy Owens, is a neurosurgeon who enjoyed surgical privileges at the defendant, New Britain General Hospital (hospital), for several years prior to the events leading up to the hospital's decision not to reappoint him to its medical staff. In 1982, the hospital's chief of surgery, Gerald O. Strauch, appointed two outside neurosurgeons, William F. Collins, Jr., and Edward B. Schlesinger, to conduct a review of the entire neurosurgery section of the hospital. At the conclusion of their review, Collins and Schlesinger issued a report (Collins-Schlesinger report) that summarized their findings and concluded, inter alia, that the plaintiff inappropriately and unjustifiably had been performing disc surgery. The Collins-Schlesinger report recommended that the plaintiff obtain second opinions in all future cases of disc sur-

gery and that the plaintiff refer certain patients for psychiatric consultations before performing particular surgical procedures. The Collins-Schlesinger report also recommended that an outside review of the neurological section be conducted on a monthly basis.

In response to the conclusions and recommendations contained in the Collins-Schlesinger report, Strauch implemented a set of measures (Strauch measures) with which the plaintiff, in writing, voluntarily agreed to comply. Pursuant to one of the Strauch measures, the plaintiff agreed to obtain second opinions for disc surgery and psychiatric consultations for patients who were to undergo certain other procedures. In accordance with a second Strauch measure, the hospital established a monthly review of the neurosurgery section, and charged Richard Simon, a neurosurgeon at the University of Connecticut Health Center, with its implementation.[1]

Subsequently, the plaintiff informed Strauch that he would no longer adhere to the Strauch measure requiring him to obtain second opinions and psychiatric consultations. Thereafter, in December, 1984, Simon rendered a lengthy report (Simon report) containing a review of the plaintiff's compliance with the Strauch measures, as well as statistical data concerning the operative procedures performed by the plaintiff. The Simon report severely criticized the plaintiff's surgical practices[2] and concluded that the plaintiff had not complied with the Strauch measure requiring second opinions and consultations.

---

[1] A third Strauch measure, banning surgery for intracranial aneurysms, is not relevant to this appeal.

[2] The Simon report stated in part: "[T]he statistics presented above indicated variance with acceptable standards of practice for lumbar surgery regarding patient selection, age of patient recurrence rates, infection rates and variance from some, but not all series regarding multiple simultaneous recurrence rates. The recurrence rates for cervical disc is unacceptable, and the lack of method of localizing discs in the cervical spine exposes [the plaintiff] to a substantial risk of operating at the wrong level."

In February, 1985, Strauch furnished the plaintiff with the Simon report and advised him to prepare a written response.[3] On receipt of the plaintiff's response, Strauch filed with the hospital staff executive committee (executive committee), in accordance with article VII, § 1 (a) of the medical staff bylaws,[4] a formal recommendation for corrective action against the plaintiff.[5] Subsequently, Strauch appointed a three person ad hoc committee, chaired by physician William Waskowitz, (Waskowitz committee) to consider Strauch's recommendation.[6]

---

[3] Although Strauch originally gave the plaintiff forty-five days to respond, at the plaintiff's request the deadline was extended to six months.

[4] Article VII, § 1 (a) of the medical staff bylaws provides in relevant part: "Whenever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the medical staff or to be disruptive to the operations of the hospital, corrective action against such practitioner may be requested by . . . the chief of any clinical department . . . . All requests for corrective action shall be in writing, shall be made to the executive committee, and shall be supported by reference to the specific activities or conduct which constitute the grounds for the request."

[5] Specifically, Strauch recommended that the plaintiff's "surgical privileges be indefinitely suspended with respect to surgical procedures on and/or related to the spine and spinal cord so as to prohibit him from doing any elective or emergency surgical procedures (including all operations and therapeutic manipulations) related to (1) degenerative disc disease or its complications or sequelae (spinal stenosis, radiculitis, arachnoiditis, etc.) or (2) relief of back pain, including but not limited to procedures related to installation, modification, manipulation and/or removal of nerve stimulators of all kinds."

Additionally, Strauch recommended "that any elective surgical procedure (including all operations and therapeutic manipulations) on the spine or spinal cord, other than those encompassed in the preceding paragraph, proposed to be done by [the plaintiff] be mandatorily reviewed by another neurosurgeon, at the discretion of the Chief of the Section of Neurosurgery, and that no such operation be permitted to be performed by [the plaintiff] unless the concurrence for such a procedure in the opinion of the reviewing neurosurgeon is present in writing in the patient's hospital record, dated within three days prior to the proposed operation."

[6] Article VII, § 1 (b) of the medical staff bylaws provides: "Whenever the corrective action could be a reduction or suspension of clinical privileges, the executive committee shall forward such request to the chief of the department wherein the practitioner has such privileges. Upon receipt of such

On October 18, 1985, after six meetings, the Waskowitz committee filed its report with the executive committee, recommending that the executive committee implement Strauch's recommendation for corrective action. In a follow-up report dated October 28, 1985, the Waskowitz committee stated that, in formulating its recommendation, it had relied on the Collins-Schlesinger report, the Simon report and thirty-five other records of the plaintiff's patients, selected by Strauch for the Waskowitz committee's review. The Waskowitz committee further stated that it had reached the following conclusions: "1. In spite of agreeing in writing to do so, [the plaintiff] failed in most cases to obtain either neurosurgical, neurological or orthopedic second opinions or indicated psychiatric consultations"; and "2. In most of the charts reviewed [the plaintiff] performed surgical procedures that were unjustifiable."

Subsequently, by letter dated October 29, 1985, George H. Bray, the hospital's chief of staff and chair of the executive committee, informed the plaintiff that the executive committee had convened to consider both Strauch's recommendation for corrective action and the Waskowitz committee's report. In the same letter, Bray invited the plaintiff to appear informally before the executive committee on November 15, 1985, for the purpose of discussing his surgical practice.[7] Bray also advised the plaintiff that, because the executive com-

request, the chief of the department shall immediately appoint an ad hoc committee of three attending physicians of the department involved to investigate the matter. The chief of the department shall appoint the chairman of this committee."

[7] Article VII, § 1 (d) of the medical staff bylaws provides in relevant part: "If the corrective action could involve a reduction or suspension of clinical privileges, or a suspension or expulsion from the medical staff, the affected practitioner shall be permitted to make an appearance before the executive committee prior to its taking action on such request. This appearance shall not constitute a hearing, shall be preliminary in nature, and none of the procedural rules provided in these bylaws with respect to hearings shall apply thereto."

mittee had voted unanimously to require him to obtain corroborative second opinions in cases involving surgery,[8] he was strongly advised to abide by the Strauch measures pending the resolution of his case. The plaintiff thereafter agreed in writing to comply with the executive committee's requests.

At the executive committee's November 15 meeting, the plaintiff addressed the executive committee, criticized both the Collins-Schlesinger and Simon reports, and presented statements from consulting experts he had retained. Following that meeting, the executive committee recommended the imposition of various restrictions on the plaintiff's clinical and surgical privileges. The plaintiff appealed from the executive committee's recommendation, thereby staying the effect of the restrictions.[9]

---

[8] The executive committee unanimously passed the following motion: "[T]hat [the plaintiff] be informed that cases involving surgery must have a current corroborative second opinion, and if this is not in confirmation of the planned procedure a third opinion will be obtained to confirm, and if neither is in agreement with your proposed surgery the surgery will be canceled."

[9] Article VIII, § 1 (a) of the medical staff bylaws provides in relevant part: "Recommendations to the board of directors by the staff executive committee . . . will give rise to a practitioner's right to a hearing and appellate review if the recommendation . . . constitutes or relates to any of the following . . . 6. Reduction in, or suspension or revocation of, clinical privileges . . . ."

Article VIII, § 3 of the medical staff bylaws provides in relevant part: "(a) If the staff executive committee has made a recommendation which, if ratified by decision of the board of directors, will adversely affect a practitioner's appointment to or status as a member of the medical staff or his exercise of clinical privileges, the practitioner shall have the right to a hearing before an ad hoc committee of the medical staff. If the staff executive committee, after considering the results of such a hearing, affirms its recommendation or modifies it so that it remains adverse to the practitioner, the practitioner shall have the right to an appellate review by the board of directors before the board makes a final decision on the matter. . . .

"(c) A practitioner shall have thirty (30) days following his [or her] receipt of a notice . . . to file a written request for a hearing. . . . A timely request made by a practitioner shall stay the effect of a recommendation or action until such time as the matter has been finally decided by the board of directors . . . ."

In response to the plaintiff's appeal, a second ad hoc committee, chaired by Thomas J. Devers (Devers committee), was appointed to hold a hearing.[10] In April, 1986, after completing the formal hearing process, the Devers committee recommended confirmation of the executive committee's recommendation to impose restrictions on the plaintiff's practice,[11] and the plaintiff appealed from that decision to the hospital board of directors.[12]

In May, 1986, while that appeal was pending, Bray informed the plaintiff that another neurosurgeon on the hospital staff, Ali Nourizadeh, had written a letter to the executive committee raising several serious

[10] Article VIII, § 4 of the medical staff bylaws provides: "(a) In implementation of this Article, there shall be developed and maintained in effect at all times a protocol setting forth the hearing and appellate review procedures to be followed at this hospital. Such protocol shall be appended to these bylaws."

Section 4 (a) of the hospital's "Protocol for Conduct of Hearings and Appellate Reviews," promulgated pursuant to article VIII, § 4 of the medical staff bylaws, provides: "When a hearing relates to an adverse recommendation by the staff executive committee, the hearing shall be conducted by an ad hoc hearing committee of not less than three (3) members of the medical staff appointed by the chief of staff in consultation with the staff executive committee. One of the members so appointed shall be designated as committee chairman. . . ."

[11] Section 5 (k) of the hospital's "Protocol for Conduct of Hearings and Appellate Reviews," promulgated pursuant to article VIII, § 4 of the medical staff bylaws, provides: "Within seven (7) days after final adjournment of a hearing, the hearing committee shall make a written report of its findings and recommendations and shall forward the same, together with the hearing record and all other documentation considered by it, to the staff executive committee . . . . The report may recommend confirmation, modification, or rejection of the original adverse recommendation or action which provided the basis for the hearing . . . ."

[12] Section 6 (a) of the hospital's "Protocol for Conduct of Hearings and Appellate Reviews," promulgated pursuant to article VIII, § 4 of the medical staff bylaws, provides: "Within seven (7) days after . . . receipt of notice of an adverse recommendation or action following a hearing, an affected practitioner may request an appellate review thereof by the Board of Directors. . . ."

charges against the plaintiff.[13] On June 9, 1986, the executive committee held a special meeting, at which the plaintiff was present, to consider the charges.[14] Following that meeting, by letter dated June 10, 1986, the plaintiff was notified that, pursuant to article V, § 3 (b) of the medical staff bylaws,[15] the executive committee had voted to recommend that he not be reappointed.[16] Subsequently, the plaintiff appealed from the executive committee's recommendation.[17]

While that appeal was pending, in late June, 1986, the plaintiff withdrew his appeal from the Devers committee's confirmation of the executive committee's recommendation to impose restrictions on his prac-

[13] Nourizadeh's letter alleged, inter alia, the following charges against the plaintiff: (1) a threat of harassment to Nourizadeh; (2) a threat to one of Nourizadeh's patients; and (3) the unexplained transfer of one of Nourizadeh's patients to the plaintiff's improper care.

[14] The special meeting was postponed to June 9, 1986, at the plaintiff's request.

[15] Article V, § 3 (b) of the medical staff bylaws provides in relevant part: "Each recommendation concerning the reappointment of a medical staff member and the clinical privileges to be granted upon reappointment shall be based upon such member's professional competence and clinical judgment in the treatment of hospital patients, his ethics and conduct, his attendance at medical staff meetings and participation in staff affairs, his compliance with the medical staff bylaws, rules and regulations, his cooperation with hospital personnel, his use of the hospital's facilities for his patients, his relations with other practitioners, and his general attitude toward hospital patients, the hospital and the public. . . ."

[16] Three days prior to the executive committee's June 9, 1986 special meeting, the executive committee had voted to recommend the plaintiff's reappointment to the hospital medical staff, subject to the Strauch measures, during its regular meeting to consider staff reappointments. The executive committee's June 9 vote not to recommend the plaintiff's reappointment superseded its June 6 vote to reappoint the plaintiff.

[17] Article V, § 2 (e) of the medical staff bylaws provides in relevant part: "When the recommendation of the executive committee is adverse to the practitioner . . . in respect to appointment . . . the chief executive officer shall promptly so notify the practitioner . . . . No such adverse recommendation shall be forwarded to the governing body until after the practitioner has exercised or has been deemed to have waived his right to a hearing as provided in Article VIII of these bylaws."

tice,[18] thereby triggering the immediate implementation of the restrictions. A three member committee subsequently began monitoring the plaintiff's practice for compliance with the restrictions.

Concurrently, in response to the plaintiff's appeal from the executive committee's recommendation not to reappoint him to the medical staff, another ad hoc committee was formed, chaired by Martin Dinep (Dinep committee).[19] After a series of hearings, the Dinep committee released its report, dated October 15, 1986, in which it unanimously upheld the executive committee's decision not to recommend the plaintiff's reappointment.[20] Subsequently, the executive committee accepted the Dinep committee's report and the plaintiff appealed to the board of directors.[21]

An appellate review committee, composed of members of the board of directors, chaired by Anthony A. Cooper (Cooper committee), was formed to review the Dinep committee's conclusions. On January 20, 1987, after three evidentiary hearings and two sessions of deliberations, the Cooper committee concluded that the executive committee's recommendation not to reappoint the plaintiff was supported by the record. Consequently, the Cooper committee unanimously recommended that the board of directors confirm the executive committee's recommendation not to reappoint the plaintiff. On February 19, 1987, the hospital officially notified the plaintiff that the board of directors had voted to terminate his medical staff privileges.

---

[18] The plaintiff's appeal from the executive committee's recommendation not to reappoint him to the medical staff was completely separate from his appeal from that committee's November decision to impose restrictions on his practice.

[19] See article VIII, § 3 (a) of the medical staff bylaws, footnote 9.

[20] During the Dinep committee's review of the plaintiff's failure to be reappointed, the hospital accidentally notified the plaintiff that the executive committee had voted during its regular meeting to reappoint him to the medical staff for the following year. See footnote 16.

[21] See article VIII, § 3 (a) of the medical staff bylaws, footnote 9.

The plaintiff initiated this action against the hospital, seeking money damages for breach of contract and negligent infliction of emotional distress, as well as injunctive relief in the form of reinstatement of his staff privileges. After the trial court rendered judgment for the hospital, the plaintiff appealed to the Appellate Court, claiming, inter alia, that the trial court improperly applied a test of substantial compliance in determining whether, in the course of terminating his staff privileges, the hospital had complied with the bylaw obligations to him.[22] On appeal, the Appellate Court affirmed the judgment of the trial court, concluding, inter alia, that: (1) the test of substantial compliance is the proper standard by which to measure the hospital's performance under the bylaws; and (2) the hospital had not breached the bylaws by failing to renew the plaintiff's medical staff privileges. *Owens* v. *New Britain General Hospital,* 32 Conn. App. 56, 58, 627 A.2d 1373 (1993). We granted the plaintiff's petition for certification limited to the following issue: "Whether the Appellate Court correctly held that the defendant hospital need only substantially comply with its [medical staff] bylaws when terminating a physician's medical staff privileges and whether the failure to renew the plaintiff's medical staff privileges constituted a breach of those medical staff bylaws?" *Owens* v. *New Britain General Hospital,* 227 Conn. 923, 632 A.2d 701 (1993). We now affirm the judgment of the Appellate Court.

Additional facts will be set forth as necessary.

[22] The plaintiff argued in the alternative that, even under a substantial compliance standard, the trial court's decision was incorrect because the trial court improperly: (1) found that the hospital had not breached the contractual bylaw obligations to provide him with adequate notice of the charges against him; (2) found that the hospital had not breached the contractual bylaw obligations to provide him with a fair opportunity to respond to the charges against him; and (3) determined that the cumulative effect of the hospital's several procedural violations did not deprive him of due process and fair procedure.

## I

The plaintiff first claims that the Appellate Court improperly concluded that the trial court had correctly applied a "substantial" rather than "strict" compliance test[23] in assessing whether the hospital had sufficiently complied with the medical staff bylaw obligations to the plaintiff in the course of terminating his medical staff privileges, because the substantial compliance test does not adequately protect the public or physicians.[24] We disagree.

In *Gianetti* v. *Norwalk Hospital,* 211 Conn. 51, 59, 62, 557 A.2d 1249 (1989), we held that although the medical staff bylaws of the Norwalk Hospital did not constitute an enforceable contract per se between the hospital and the plaintiff as a member of the hospital medical staff, administrative decisions by the hospital affecting the plaintiff's rights as a medical staff mem-

[23] Although, in its memorandum of decision, the trial court did not expressly articulate what standard it was applying, the parties agree that the trial court in essence applied a substantial compliance test.

[24] The plaintiff also argues that the trial court should have applied a strict compliance test because his right to practice medicine involves a "fundamental" right creating the obligation on the part of the hospital to adhere strictly to the bylaw procedures created to protect that right. To the extent that the plaintiff rests his argument on state or federal constitutional law, we reject it. The due process clauses of the state constitution; Conn. Const., art. I, § 8; and federal constitution; U.S. Const., amends. V and XIV; protect individuals against only governmental, rather than private, deprivations of property. J. Nowak, R. Rotunda & J. Young, Constitutional Law (2d Ed. 1983) p. 546. Under the facts of this case, the private hospital's actions terminating the plaintiff's privileges do not constitute state action and, therefore, are not subject to scrutiny for compliance with procedural "due process" that is constitutionally required when there is state action.

Insofar as the plaintiff argues that, under the common law, "fundamental fairness" requires the hospital to provide him with a certain quantum of procedural safeguards, his argument is subsumed by our conclusion that the substantial compliance test adequately protects the plaintiff's interest in practicing medicine by ensuring the provision of notice and an opportunity to be heard before an impartial tribunal.

ber under the bylaws were nevertheless subject to judicial review.[25] In the present case, the parties do not dispute that the hospital, a private nonprofit corporation,[26] was bound by its own bylaws in deciding to revoke the plaintiff's medical staff privileges. Additionally, the parties agree that such an administrative decision of the hospital is subject to some form of judicial

[25] In *Gianetti* v. *Norwalk Hospital*, supra, 211 Conn. 59–60, we noted that the hospital had a preexisting legal duty imposed by state health regulations to adopt and abide by its medical staff bylaws. Accordingly, we reasoned that the hospital's agreement with the plaintiff to abide by the bylaws, in and of itself, did not constitute valid consideration to support an enforceable contract. Id. After looking beyond the bylaws themselves, however, we concluded that a contractual relationship existed between the hospital and the plaintiff. Id., 62–63. Specifically, we stated that the hospital's extension of medical staff privileges to the physician, in return for his agreement to abide by the medical staff bylaws, established the contractual mutuality, supported by valid consideration, necessary to support an enforceable contract. Id., 63. We further stated that these undertakings of the plaintiff and the hospital, coupled with the hospital's duty to obey its bylaws, rendered the bylaws " 'an enforceable *part* of the contract' " between the hospital and the plaintiff. (Emphasis in original.) Id. Accordingly, we concluded that the hospital's administrative decisions concerning medical staff privileges under the bylaws were subject to judicial review. Id., 64.

[26] In *Gianetti* v. *Norwalk Hospital*, supra, 211 Conn. 64, we noted that some jurisdictions have focused on the distinction between public and private hospitals when resolving the issue of judicial reviewability of a hospital's administrative decision to exclude a physician from its medical staff. We further noted that the majority of jurisdictions have refused judicial review of *exclusions* from the medical staffs of *private* nonprofit hospitals, thereby according such hospitals the " 'absolute right' " to exclude any physician from its medical staff. Id., 64–65; see, e.g., *Barrows* v. *Northwestern Memorial Hospital*, 123 Ill. 2d 49, 52, 525 N.E.2d 50 (1988); *Jain* v. *Northwest Community Hospital*, 67 Ill. App. 3d 420, 426–27, 385 N.E.2d 108 (1978).

The defendant hospital in *Gianetti* v. *Norwalk Hospital*, supra, 211 Conn. 51, as in the present case, was a private nonprofit corporation. Additionally, in *Gianetti*, as in this case, an enforceable contract existed between the plaintiff and the hospital. We were thus not called upon in *Gianetti* to decide whether, in the absence of such a contract, a private hospital's decision to deny or suspend a physician's staff privileges would be immune from judicial review. In the present case, we likewise leave that issue for another day.

review. The parties disagree, however, as to the proper test of compliance—an issue we did not reach in *Gianetti* v. *Norwalk Hospital,* supra, 211 Conn. 51. We resolve this issue in favor of the hospital and conclude that a substantial compliance test as adopted by the Appellate Court is the proper test by which to measure whether a hospital has sufficiently complied with its bylaws in terminating a physician's medical staff privileges.

We arrive at this conclusion in appreciation of the overarching function that medical staff bylaws are designed to serve—the provision of quality medical care to the surrounding public community. See *Davis* v. *Morristown Memorial Hospital,* 106 N.J. Super. 33, 43, 254 A.2d 125 (1969) (in adopting medical staff bylaws, hospital should consider whether particular provision promotes " 'sound hospital standards' in 'faithfully furnishing facilities to the members of the medical profession in aid of their service to the public' "). Medical staff bylaws reflect what the medical community considers to be crucial to the effective administration of the hospital and the provision of quality medical care by physicians whose performance has earned them privileges. At the same time, the procedural protocol of the bylaws "provide, outside of the judicial system, a fair method for making decisions concerning staff privileges." *Nanavati* v. *Burdette Tomlin Memorial Hospital,* 107 N.J. 240, 251, 526 A.2d 697 (1987).

We therefore recognize that the obligation to follow medical staff bylaws is paramount and that a hospital must afford its medical staff all the process and protections encompassed by its bylaws. See, e.g., *Shulman* v. *Washington Hospital Center,* 222 F. Sup. 59, 64 (D.D.C. 1963); *Scappatura* v. *Baptist Hospital of Phoenix,* 120 Ariz. 204, 208, 584 P.2d 1195 (1978); *Berberian* v. *Lancaster Osteopathic Hospital Assn.,* 395 Pa. 257, 263–64, 149 A.2d 456 (1959). A hospital's obligation

to follow bylaws can stem from a contractual relationship between the hospital and the physician. *Berberian* v. *Lancaster Osteopathic Hospital Assn.,* supra, 263. It can also be based on a preexisting legal duty imposed by our state department of health regulations to adopt " 'bylaws, rules and regulations, including medical staff bylaws.' " *Gianetti* v. *Norwalk Hospital,* supra, 211 Conn. 59 (legal duty to adopt medical staff bylaws under § 19-13-D3 [b] [1] [A] of the Regulations of Connecticut State Agencies, "a fortiori, imposes a legal duty upon the Norwalk Hospital to abide by such bylaws"). The obligation can also stem from the recognition of a "fiduciary concept." *Greisman* v. *Newcomb Hospital,* 40 N.J. 389, 404, 192 A.2d 817 (1963) ("[hospital officials] must recognize that their powers, particularly those relating to the selection of staff members, are powers in trust which are always to be dealt with as such").

A hospital's obligation to follow its bylaws also arises from the public's substantial interest in the operation of hospitals, public or private. "Hospitals exist to provide health care to the public. In addition to serving the needs of their patients, hospitals also provide a place of employment for doctors and other professionals. The privilege to admit and treat patients at a hospital can be critical to a doctor's ability to practice his [or her] profession and to treat patients. Both doctors and patients can suffer if otherwise qualified doctors are wrongly denied staff privileges." *Nanavati* v. *Burdette Tomlin Memorial Hospital,* supra, 107 N.J. 248. Consequently, hospitals must treat physicians fairly in making decisions about their privileges because patients need physicians and they, in turn, need hospital privileges to serve their patients. Therefore, in establishing standards for granting or maintaining staff appointment or clinical privileges, hospitals must ensure that these standards are rationally related to

the delivery of quality health care to patients. Id., 249. The public has an interest that staff decisions are not made arbitrarily. By requiring hospitals to adhere to their bylaws, the risk of arbitrary decisions is reduced. *Balkissoon* v. *Capitol Hill Hospital,* 558 A.2d 304, 308 (D.C. App. 1989).

There must also be concern, however, for unnecessary judicial interference with those whose duty it is to make the decisions and who have the necessary expertise with which to act. Courts are generally unwilling "to substitute their judgment on the merits for the professional judgment of medical and hospital officials with superior qualifications to make such decisions." *Mahmoodian* v. *United Hospital Center, Inc.,* 185 W. Va. 59, 65, 404 S.E.2d 750, cert. denied, 502 U.S. 863, 112 S. Ct. 185, 116 L. Ed. 2d 146 (1991). "In so specialized and sensitive an activity as governing a hospital, courts are well advised to defer to those with the duty to govern." *Nanavati* v. *Burdette Tomlin Memorial Hospital,* supra, 107 N.J. 251. Although a hospital is bound by its bylaws, judicial review of a hospital board's decision to suspend a physician's privileges focuses on the reasonableness of the action taken in relation to the interests of the parties and the public. *Garrow* v. *Elizabeth General Hospital & Dispensary,* 79 N.J. 549, 565, 401 A.2d 533 (1979).

The special nature of the proceedings involved in matters relating to determinations of the professional competence and capability of a physician to practice medicine in a hospital setting prompted the Appellate Court to conclude that decisions concerning whether a physician is entitled to staff privileges should be left to the expertise of the hospital's staff and administration. The exercise of their discretion should be subject only to limited judicial surveillance to determine if the hospital substantially complied with its applicable bylaw

procedures.[27] This conclusion is consistent with the position held by the majority of the jurisdictions. By relying on breach of contract principles, these courts have applied a limited scope of judicial review to ensure that the hospital had substantially complied with its bylaws and to ensure that those bylaws provided basic notice and fair hearing procedures, including an impar-

---

[27] Prompted by these same concerns, courts have analogized the decisions of hospitals concerning staff privileges to decisions made by administrative agencies. See, e.g., *Shulman* v. *Washington Hospital Center,* supra, 222 F. Sup. 64 (courts are not in position to substitute their judgment for that of professional groups in matters concerning medical staff privileges); *Balkissoon* v. *Capitol Hill Hospital,* supra, 558 A.2d 310 (hospital staffing decisions must be left to expertise of the staff and administration of the hospital); *Kiracofe* v. *Reid Memorial Hospital,* 461 N.E.2d 1134, 1140–41 (Ind. App. 1984) (court should review hospital decision regarding medical staff privileges to determine whether hospital used fair procedures and standards and whether the standards were applied in arbitrary and capricious fashion); *Bricker* v. *Sceva Speare Memorial Hospital,* 111 N.H. 276, 280, 281 A.2d 589, cert. denied, 404 U.S. 995, 92 S. Ct. 535, 30 L. Ed. 2d 547 (1971) (hospital board must make intelligent and reasonable judgment in good faith); *Garrow* v. *Elizabeth General Hospital & Dispensary,* supra, 79 N.J. 558 (because administrative agencies and hospital boards of trustees exercise discretion and bring expertise to their respective tasks, "[b]oth must also pay due respect to procedural safeguards whether because of constitutional due process or fundamental fairness"); *Gotsis* v. *Lorain Community Hospital,* 46 Ohio App. 2d 8, 18, 345 N.E.2d 641 (1974) (hospital's decisions concerning members of its staff must rest on sound, reasonable judgment, and courts will not intervene, unless judgment is arbitrary, capricious or discriminatory); *Huffaker* v. *Bailey,* 273 Or. 273, 280–81, 540 P.2d 1398 (1975) (court must sustain hospital board's good faith decision regarding medical staff privileges if supported by adequate factual basis). "Regardless of the phraseology of these courts, the prevailing standard for judicial review of the findings of a private hospital in these decisions affecting medical staff members' privileges appears to be either an arbitrary and capricious (or abuse of discretion) standard or a substantial evidence standard." *Mahmoodian* v. *United Hospital Center, Inc.,* supra, 185 W. Va. 71.

The prevailing standard for judicial review of the findings of a private hospital in decisions affecting medical staff privileges is also consistent with the level of evidence necessary upon judicial review to support a decision by an administrative agency. See, e.g., *Miller* v. *National Medical Hospital of Monterey Park, Inc.,* 124 Cal. App. 3d 81, 84, 177 Cal. Rptr. 119 (1981) (hospital board's findings must be supported by " 'substantial evidence in light of whole record' "); *Even* v. *Longmont United Hospital Assn.,* 629 P.2d

tial tribunal.[28] See, e.g., *Shulman* v. *Washington Hospital Center,* supra, 222 F. Sup. 63, 64; *Eidelson* v. *Archer,* 645 P.2d 171, 175 n.13 (Alaska 1982) (citing cases from other jurisdictions); *Gaenslen* v. *Board of Directors,* 185 Cal. App. 3d 563, 568, 232 Cal. Rptr. 239 (1985); *Adkins* v. *Sarah Bush Lincoln Health Center,* 129 Ill. 2d 497, 506–507, 509–10, 514, 544 N.E.2d 733 (1989); *Pepple* v. *Parkview Memorial Hospital, Inc.,* 536 N.E.2d 274, 276 (Ind. 1989).

Against this backdrop of competing interests, we conclude that the substantial compliance test ensures procedural fairness to the physician while preserving decisions concerning staff privileges for the expert judgment of hospital officials.

## II

Having concluded that the substantial compliance test is the proper standard by which to measure whether the hospital sufficiently complied with its medical staff bylaws in terminating the plaintiff's medical

---

1100, 1103 (Colo. App. 1981) (findings of hospital board were supported by competent evidence, and are binding on review); *Straube* v. *Emanuel Lutheran Charity Board,* 287 Or. 375, 384, 600 P.2d 381 (1979), cert. denied, 445 U.S. 966, 100 S. Ct. 1657, 64 L. Ed. 2d 242 (1980) (en banc) (court must uphold hospital board's decision to discipline physician so long as reasonable procedures were followed and evidence exists from which the hospital board could have found that physician's conduct posed threat to patient's care).

[28] A minority of jurisdictions provide no review. See, e.g., *Sarin* v. *Samaritan Health Center,* 176 Mich. App. 790, 793–95, 440 N.W.2d 80, cert. denied, 433 Mich. 919 (1989) (no judicial review of private hospital's decision to terminate medical staff privileges, not even to ensure compliance with medical staff bylaws' methods for reaching that decision); *Medical Center Hospitals* v. *Terzis,* 235 Va. 443, 445–46, 367 S.E.2d 728 (1988) (statute on judicial review of hospitals' decisions adversely affecting existing medical staff members' privileges does not authorize judicial review of procedures employed by hospitals in reaching such decisions, provided hospitals' decisions are in writing and are based on certain statutorily permitted reasons).

Neither party has pointed to, nor has our research disclosed, any jurisdiction that provides for anything greater than substantial compliance with applicable bylaws.

staff privileges, we turn to the application of that test to the facts of this case. The plaintiff argues that the Appellate Court improperly sustained the trial court's findings that the hospital had not breached the bylaw obligations to provide him with: (1) notice of and an opportunity to respond to the cases that formed the basis of the Collins-Schlesinger report; (2) an opportunity during the Cooper committee hearing to present evidence of his compliance with the restrictions on his privileges; and (3) generally fair procedures. We reject each of the plaintiff's claims and conclude, consistent with the Appellate Court's decision, that the trial court correctly determined that the hospital had substantially complied with the bylaws.

A

Each of the plaintiff's claims presents a challenge to the factual findings and conclusions of the trial court with respect to the hospital's procedural compliance with the bylaws. We therefore begin, as the Appellate Court did, by setting forth the appropriate standard of our judicial review. We have long held that "where the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." *Pandolphe's Auto Parts, Inc.* v. *Manchester,* 181 Conn. 217, 221–22, 435 A.2d 24 (1980). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Crowell* v. *Danforth,* 222 Conn. 150, 156, 609 A.2d 654 (1992).

## 1

The plaintiff first argues that the trial court improperly determined that the hospital did not breach its obligation under the medical staff bylaws to provide him with adequate notice and a sufficient opportunity to defend himself. Specifically, the plaintiff argues that prior to his hearing before the Devers committee, he was entitled under the notice provisions of the bylaws[29] to a list of the patient charts supporting the Collins-Schlesinger report's claim of unnecessary surgery. In the absence of such a list, the plaintiff contends he was powerless to defend himself against the report's adverse conclusions. In support of his arguments, the plaintiff focuses on two of the hospital's uses of the Collins-Schlesinger report. First, the plaintiff asserts that the Devers committee used the substantive conclusions in the report as a basis for confirming the executive committee's recommendation to impose restrictions on his privileges. Second, the plaintiff asserts that the Dinep committee relied on his noncompliance with the Strauch measures, which implemented the Collins-Schlesinger report, as a ground for not reappointing him to the medical staff. We reject the plaintiff's arguments and conclude that the hospital did not violate the "notice" and "opportunity to respond" provisions of the bylaws through either use of the Collins-Schlesinger report.

---

[29] The plaintiff specifically relies on § 2 of the "Protocol for Conduct of Hearings and Appellate Reviews," promulgated pursuant to article VIII, § 4 of the medical staff bylaws, which states in relevant part: *"Notice of Hearing.* The chief executive officer shall notify an affected practitioner . . . that a hearing has been scheduled in response to the practitioner's request. The notice shall be in writing and shall *contain a concise statement of the acts or omissions with which the practitioner has been charged, a list of charts being questioned, or other reasons for an adverse recommendation or action. . . ."* (Emphasis added.)

As already stated, the plaintiff voluntarily withdrew his appeal from the decision of the Devers committee confirming the executive committee's recommendation to impose restrictions on his privileges. On withdrawing his appeal, the plaintiff admitted his understanding that, pursuant to the bylaws, the executive committee's recommendation for restrictions would be forwarded for approval by the board of directors and that the recommendation was likely to be formally imposed by the board of directors.[30] Article VIII, § 3 (d) of the medical staff bylaws provides in part: "The failure of a practitioner to request . . . review to which he is entitled by these bylaws within the time and in the manner provided for herein shall be deemed a waiver of his right to such . . . appellate review . . . with respect to the matter. When the hearing or appellate review waived relates to a recommendation of the staff executive committee . . . the recommendation shall become and remain effective against the practitioner pending the board of directors' decision on the matter." Under these bylaw provisions, by virtue of withdrawing his appeal from the Devers committee's confirmation of the executive committee's recommendation to impose restrictions on his practice, the plaintiff waived his right to any further appeal from that recommendation. Accordingly, we conclude that the plaintiff is now precluded from raising any claims concerning the propriety of the Devers committee's use of the Collins-Schlesinger report.

We also conclude that the Dinep committee's use of the Collins-Schlesinger report did not deprive the plaintiff of notice of or an opportunity to defend himself against the cases that formed the basis of the report. In their report, Collins and Schlesinger state that their review consisted of, inter alia, an evaluation of:

[30] Neither party disputes that the board of directors formally imposed the executive committee's recommendation.

(1) approximately sixty charts, randomly selected from neurosurgical admissions between October, 1980, and September, 1982; (2) the dossiers of the three attending neurosurgeons in the section at the time; and (3) a computer printout of the cases admitted to the neurosurgical section of the hospital between October 1, 1980, and March 13, 1982. The defendant asserts, and the plaintiff does not contest, that the plaintiff had been furnished with a copy of the report, prior to agreeing voluntarily to comply with the Strauch measures. Moreover, before the report was released, the plaintiff met with Collins and Schlesinger to discuss their review of his files and of the neurosurgical section in general. In light of these circumstances, we are persuaded that the plaintiff received adequate notice of the time frame and parameters of the Collins-Schlesinger review and had an opportunity to apprise himself of some, if not all, of the cases that formed the basis for the report's critical conclusions. By so providing the plaintiff with notice and an opportunity to defend himself, we conclude that the hospital sufficiently complied with the bylaws under the substantial compliance test. Accordingly, we conclude that the trial court properly determined that the plaintiff had ample notice of and an opportunity to respond to the issues considered by the Dinep committee concerning the Collins-Schlesinger report.

2

The plaintiff also argues that the hospital's reliance on his failure to abide by the Strauch measures as a ground for not recommending his reappointment was improper because Strauch lacked the authority under the bylaws to impose unilaterally the Strauch measures without resort to the review procedures set forth in articles VII and VIII of the bylaws. The plaintiff argues that when he withdrew his voluntary adherence to the measures, Strauch should have taken immediate action

to impose the Strauch measures as restrictions on his privileges under the bylaws. The plaintiff contends that in failing to do so, the hospital improperly terminated his medical staff privileges on the basis of his failure to abide by the Strauch measures, after having taken no timely steps to render the measures enforceable against him. We reject this argument.

Despite the plaintiff's claim to the contrary, Strauch timely took appropriate action under the bylaws to impose the Strauch measures as restrictions on the plaintiff's medical practice. The plaintiff does not contest that Strauch had the authority in the first instance to order the Collins-Schlesinger review of the neurosurgical section. On the basis of that review, Collins and Schlesinger concluded that the plaintiff had been performing unnecessary surgery. When the plaintiff failed voluntarily to rectify his deficient medical practices, Strauch ultimately sought corrective action under article VII of the bylaws. The plaintiff has not indicated and we do not find any provision of article VII indicating the time frame within which Strauch had to request such corrective action. In fact, article VII, § 1 (a) authorizes Strauch to request corrective action "[w]henever the activities or professional conduct of any practitioner with clinical privileges are considered to be lower than the standards or aims of the medical staff or to be disruptive to the operations of the hospital . . . ." (Emphasis added.) Strauch waited as long as he did to seek corrective action against the plaintiff because he initially afforded the plaintiff the chance to conform to proper medical procedures and safeguards voluntarily. We decline to penalize the hospital for these efforts and conclude that Strauch timely took action to impose the Strauch measures as restrictions on the plaintiff's privileges.

We also conclude that the hospital did not "punish" the plaintiff for his failure to abide by the Strauch mea-

sures before they had been officially enforced. As stated, the Strauch measures were implemented in response to the Collins-Schlesinger report's very serious conclusion that the plaintiff had been performing unnecessary surgeries. The measures, therefore, were designed to prevent future unnecessary surgeries and to realize the requisite level of quality medical care within the neurosurgery section of the hospital. When it imposed Strauch's request for corrective action, the hospital did not rely on the fact that the plaintiff had withdrawn his earlier agreement to comply with the Strauch measures. Rather, the hospital took adverse action against the plaintiff because, on the basis of the initial conclusion of the Collins-Schlesinger report and the independent conclusion of the Simon report, he had been performing and was *continuing to* perform unnecessary surgeries.

Moreover, when the executive committee, the Dinep committee and the Cooper committee each considered the hospital's decision not to recommend the plaintiff's reappointment, the Strauch measures had long been imposed as restrictions on the plaintiff's practice. Once it had ratified the Strauch measures as restrictions, the hospital focused on the plaintiff's *continued* failure to adhere to those restrictions, not on his earlier refusal to comport with the Strauch measures. Therefore, we conclude that the hospital properly terminated the plaintiff's medical staff privileges and did not incorrectly rely on his failure to comply voluntarily with the Strauch measures prior to their enforcement through the bylaws.[31]

---

[31] The plaintiff argues that, in disposing of this claim, the Appellate Court improperly concluded that by virtue of the plaintiff's earlier agreement to comply with the Strauch measures, he had waived his right to claim any breach of the bylaws resulting from the imposition of those measures. Because we resolve the plaintiff's claim on different grounds, we need not address this argument.

## B

The plaintiff next claims that the trial court improperly found that the hospital substantially complied with its bylaws because it denied him an opportunity during the Cooper committee hearing adequately to rebut evidence of his noncompliance with the restrictions on his privileges in connection to specific cases that he alleges were first brought to his attention at the appellate review level. The following additional facts are necessary to the disposition of this claim. During the Cooper committee appellate review process, the executive committee, represented by Antoinette Capriglione, a staff physician, referred to several specific case examples demonstrating the plaintiff's alleged failure to comport with his practice restrictions. The plaintiff protested the inclusion of the cases, claiming that he had been unaware that his compliance with the practice restrictions was in question with respect to the cases and that in any event, he had never been afforded the opportunity to refute the allegations of noncompliance. Thereafter, on his request, the plaintiff was presented with a list of the cases approximately one week prior to the final Cooper committee hearing. At that hearing, the Cooper committee permitted the plaintiff to discuss the cases and to make oral reference to specific charts in the cases.

Notwithstanding his ability to discuss the cases, the plaintiff claims that the Cooper committee violated the bylaws by its refusal: (1) to permit him to present objective evidence of the existence of required second opinions and consultations in the actual medical charts at the final hearing; or (2) to remand the issue of his compliance back to the fact-finding level to hear such evidence. We disagree.

The Appellate Court directly addressed this claim and concluded that the Cooper committee did not violate the bylaws. The Appellate Court noted that § 6 (g) of the "Protocol for Conduct of Hearings and Appellate Reviews," promulgated pursuant to article VIII, § 4 of the medical staff bylaws, provides that it is within the Cooper committee's discretion to consider, "under unusual circumstances," " '[n]ew or additional matters not raised or presented during the original hearing or in the hearing committee and not otherwise reflected in the record of proceedings . . . .' " *Owens* v. *New Britain General Hospital*, supra, 32 Conn. App. 82. The Appellate Court reasoned that, although this bylaw provision authorized the Cooper committee to have considered new case examples of the plaintiff's noncompliance, it nevertheless did not rely on that evidence as a basis for its decision to affirm the executive committee's decision.

Our exhaustive review of the record supports this conclusion.[32] The Cooper committee report directly addressed its decision not to consider evidence of the plaintiff's compliance with the restrictions on his practice, which he had accepted when he withdrew his appeal from the Devers committee decision after the executive committee's June 9, 1986 decision not to recommend his reappointment. The Cooper committee report stated: "[The plaintiff] requested that . . . Bray describe events relating to [the] supervision of [the plaintiff's] practice *since* the [executive committee's] decision of June 9, 1986. [This committee] determined that its purpose was to review the June 9th decision and matters leading up to it [and] not to inves-

[32] Although the Appellate Court's analysis of the plaintiff's claim focuses only on the propriety of the Cooper committee's consideration of case examples evidencing the plaintiff's noncompliance *after* June 9, 1986, both our interpretation of the plaintiff's claim and our review of the record has persuaded us to analyze the propriety of the Cooper committee's consideration of such case examples arising both prior to and after June 9, 1986.

tigate subsequent events." (Emphasis added.) The report further stated: "[The plaintiff's] attorney claimed that the [executive committee] violated [the plaintiff's] rights by basing its June 9th decision upon cases which had not been discussed with [the plaintiff]. [This committee] concluded in deliberations, based upon consideration of the overall record and statements made during . . . sessions by . . . Bray and Capriglione, that two or three specific matters within the few weeks prior to the June 9th decision did not play a significant part in the [executive committee's] decision and that the process was therefore not unfair to [the plaintiff] in that regard." These passages persuade us that the Appellate Court correctly determined that the Cooper committee did not violate the bylaws.

Even if the Cooper committee had relied on the case examples as a basis for its decision to affirm the executive committee's decision, we conclude that, in so doing, it operated within its discretion under the bylaws because the plaintiff had sufficient notice, and an opportunity to present evidence in defense of those cases. It is undisputed that, at his own request, the plaintiff received a list of the cases prior to the final Cooper committee hearing. It is also undisputed that the plaintiff was afforded an opportunity to discuss the cases and to refer orally to the medical charts at the final Cooper committee hearing. Moreover, despite his claim to the contrary, the plaintiff points to no authority precluding him from actually bringing in with him the medical charts to the hearing.[33]

---

[33] In fact, the plaintiff requested the cases for the express purpose of being afforded the opportunity to bring in "all the documentation . . . to show that, in fact, [he] had complied with everything." The plaintiff therefore, by his own admission, had an opportunity to review the patient charts for evidence of his compliance with the restrictions and to bring with him copies of the patient charts to the final Cooper committee hearing.

We conclude, in accordance with the Appellate Court, that the trial court properly determined that to the extent the hospital considered any new material, "extra care was taken on [its] part . . . to conduct additional sessions to incorporate the new material so as to fairly put the plaintiff on notice and to permit him to respond adequately."

## III

The plaintiff's final claim is that the trial court improperly concluded that the "cumulative effect" of the hospital's deviations from the bylaws did not deprive him of fundamentally fair process. As the Appellate Court determined, "[t]his claim merely reiterates all of the issues raised in the [plaintiff's] two previous claims . . . ." *Owens* v. *New Britain General Hospital,* supra, 32 Conn. App. 83–84. Because we have concluded that the trial court properly determined that the hospital substantially complied with the bylaw obligations to provide the plaintiff with adequate notice of and an opportunity to respond to the charges against him, we need not address this claim.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.