Obstetricians and Gynecologists concluded that plaintiff had exercised "poor judgment" and had failed to "demonstrate foresight to anticipate complications of care." *Id.* The American College of Obstetricians and Gynecologists report also stated that plaintiff's "failure to recognize critical signs of fetal and maternal compromise prevents him from recognizing the need to seek assistance of from providing optimal obstetric care based on recognized, published standards of care." *Id.* Finally, the American College of Obstetricians and Gynecologists concluded that "[a]ttempts to rehabilitate [plaintiff] within Herrick Memorial Hospital can not succeed due to lack of patient volume, acuity of care, and personal-social relationships previously established at this hospital." *Id.* Based on this report, we believe that any damage that may be done to plaintiff's professional reputation is substantially outweighed by the harm that defendants and the public would suffer if plaintiff continues to practice medicine without additional training. Because the balance of harms weighs against granting the preliminary injunction, and because plaintiff is not likely to prevail on the merits, we conclude that the district court abused its discretion when it granted the preliminary injunction in this case.

We have interlocutory appellate jurisdiction in this case only to review the propriety of the injunction under 28 U.S.C. § 1292(a)(1), not to review on an interlocutory basis the denial of defendants' motion for summary judgment. Accordingly, the preliminary injunction is dissolved.

---

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0026P (6th Cir.)
File Name:  00a0026p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DONALD R. SAMUEL, M.D.,
    *Plaintiff-Appellee,*

    *v.*      No. 99-1462

HERRICK MEMORIAL HOSPITAL, LENAWEE HEALTH ALLIANCE, DR. LAURIE BARKWAY, DAVID HICKMAN, DR. MICHAEL SAMMARCO, MICHAEL MIHORA, JOHN ROBERTSTAD, HAROLD EASTON and LINDA YIELDING,

    *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 99-60140—George C. Steeh, District Judge.

Argued:  June 9, 1999

Decided and Filed:  January 18, 2000

Before:  MERRITT, DAUGHTREY, and MOORE, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:**    David A. French, MILLER, CANFIELD, PADDOCK & STONE, Ann Arbor, Michigan, for Appellants. Robert A. Maxwell, DENISON & MAXWELL, Bloomfield Hills, Michigan, for Appellee.

———————————

**OPINION**

———————————

MERRITT, Circuit Judge.  This appeal from a grant of a preliminary injunction concerns the suspension of staff privileges to plaintiff, Donald Samuel, M.D., an obstetrician/gynecologist, by defendant Herrick Memorial Hospital.  After Herrick Memorial suspended plaintiff's staff privileges, he moved the district court for a preliminary injunction enjoining the suspension.   The district court granted the injunction, thereby reinstating plaintiff's privileges with certain conditions.  Defendants appealed the grant of the injunction to this Court.  This Court stayed enforcement of the injunction by order dated May 14, 1999.  The case comes to our panel from the motions docket and we heard oral argument on the motion to stay.  For the reasons that follow, we now vacate the injunction and remand the case to the district court for further proceedings.

**I.**

Plaintiff is an African-American physician with a private practice in Tecumseh, a small community between Toledo, Ann Arbor and Detroit.  He attended medical school in Toledo and completed his residency in obstetrics and gynecology at a hospital in Michigan.  He set up a practice in Texas and, in 1990, he was recruited by Herrick Memorial to be its staff OB/GYN because Tecumseh did not have one in the community.  In 1992, plaintiff set up a private practice,

interfere with plaintiff's business relationships.  As explained above, we do not believe plaintiff has shown a likelihood of success on the merits of the underlying claims that form the bases for his conspiracy claim.  Nor has plaintiff stated any specifics as to how defendants conspired against him.  Basically, plaintiff has alleged that defendants conspired to drive him out of business either because of his race and/or because they did not want any competition in the obstetrics and gynecology area.  Plaintiff offers little in the way of support for these conspiracy theories except the hiring of Dr. Sammarco and the results of the peer review process.  As explained above, thus far plaintiff has not put forth any facts demonstrating an improper motive behind these actions.  Therefore, we do not find that plaintiff has demonstrated a likelihood of success on the merits as to a conspiracy underlying any of these claims.

We also believe that the district court erred when it determined that the balance of harms in this case weighs in favor of granting the preliminary injunction.  The district court granted the preliminary injunction because it determined that the sanctions imposed by the hospital would cause irreparable harm to the plaintiff's professional reputation in the community.  *See* Order Granting Preliminary Injunction at 7 ("[P]laintiff is facing not only financial ruin and insolvency if injunctive relief is not granted, but the destruction of his professional reputation and with it, the loss of any chance to rebuild his now burgeoning medical practice.")  In reaching its decision, however, the district court failed to give sufficient weight to the harm that defendants and the public would suffer if the plaintiff is allowed to continue to practice obstetrics and gynecology without first receiving further medical training.

Indeed, the results of the on-site review that was performed by the American College of Obstetricians and Gynecologists show that plaintiff's poor judgment and clinical deficiencies have endangered his patients on several occasions.  Report of Site Visit at 30.  In its report, the American College of

*Gen. Hosp.*, 229 Conn. 592, 643 A.2d 233 (1994); *Lewisburg Comm. Hosp., Inc. v. Alfredson*, 805 S.W.2d 756 (Tenn. 1991); *Wong v. Garden Park Comm. Hosp., Inc.*, 565 So. 2d 550 (Miss. 1990); *Bouquett v. St. Elizabeth Corp.*, 43 Ohio St. 3d 50, 558 N.E.2d 113 (1989); *Bock v. John C. Lincoln Hosp.*, 145 Ariz. 432, 702 P.2d 253 (Ariz. Ct. of App. 1985); *Spencer v. Community Hosp. of Evanston*, 87 Ill. App. 3d 214, 408 N.E.2d 981 (1980); *Margolin v. Morton F. Plant Hosp. Ass'n, Inc.*, 348 So. 2d 57 (Fla. App. 1977). Michigan follows an even more stringent rule that does not allow any review, even to ensure that the methods put forth by hospital for peer review are followed. *See, e.g., Sarin v. Samaritan Health Center*, 176 Mich. App. 790, 795, 440 N.W.2d 80 (1989); *accord Zipper v. Health Midwest*, 978 S.W.2d 398 (Mo. App. 1998); *Winston v. American Med. Int'l, Inc.*, 930 S.W.2d 945 (Tex. Civ. App. – Houston 1997). The third option, followed by a small but apparently growing number of states, allows judicial review to ensure that the hospital's decision was not arbitrary and capricious or otherwise unreasonable. The laws in these jurisdictions require that the hospital's decision to suspend or otherwise limit a physician's access to the hospital facilities be supported by "some" evidence or allow some further analysis beyond review only of adherence by the hospital to its procedures. *See, e.g., Cooper v. Delaware Valley Med. Center*, 539 Pa. 620, 654 A.2d 547 (1995); *Zoneraich v. Overlook Hosp.*, 212 N.J. Super. 83, 514 A.2d 53 (1986).

In light of Michigan's flat rule against judicial intervention, we conclude that the district court erred in finding a likelihood of success on the merits on the tortious interference with contractual relations and business relationships claim.

**4.  *Conspiracy Claim***

Plaintiff's conspiracy claim includes allegations of a conspiracy to unreasonably restrain plaintiff from practicing medicine in the community, a conspiracy to discriminate against plaintiff based on his race and a conspiracy to

with financial backing by Herrick Memorial, and he was extended staff privileges at Herrick Memorial. In 1996 he became Chief of Staff at the hospital.

In 1996, defendant Lenawee Health Alliance purchased Herrick Memorial and nearby Emma Bixby Memorial Hospital, the only two hospitals in Tecumseh, and runs them under a joint operating agreement. Plaintiff was a vigorous opponent of this joint venture and claims that the hospital has been trying to drive him out ever since. After the purchase, Lenawee Health Alliance started looking for another OB/GYN, despite plaintiff's protests that the area could not support another OB/GYN. Over that protest, defendant Dr. Sammarco, who is white, was hired as the staff OB/GYN at Herrick Memorial.

In October 1998 one of plaintiff's patients died from hemorrhaging after a caesarean delivery. The death was plaintiff's first maternal death in 10 years of practice. After the death, the hospital required him to consult with another physician, in this case Dr. Sammarco, the only other OB/GYN at Herrick Memorial, upon admitting a patient to the hospital. This monitoring arrangement went on for four months, during the pendency of the hearing process required by the hospital's bylaws, and continued until this Court stayed enforcement of the injunction and reimposed the suspension of privileges in May at the request of defendants.

The hospital's Ad Hoc Hearing Committee held a hearing on January 27, 1999, at which two physicians testified as to plaintiff's competence and stated that plaintiff was not to blame for the death. On February 3, 1999, the Ad Hoc Hearing Committee recommended to the Medical Executive Committee that the monitoring be discontinued pending the results of an external review to be conducted by the American College of Obstetricians and Gynecologists. The Medical Executive Committee rejected the Ad Hoc Committee's recommendation and the monitoring requirement continued.

In February 1999, three reviewers from the American College of Obstetricians and Gynecologists conducted an on-site review of Herrick Memorial's obstetrics unit, at the hospital's request. One reviewer was the Director of Medical Education in the Department of Obstetrics and Gynecology at Children's Hospital in Buffalo, New York, and another, an African-American, was from the Department of Obstetrics and Gynecology at the University of Chicago. The third reviewer was a medical writer and computer specialist. The review included interviews with staff members and a review of some of plaintiff's case charts, although the reviewers knew plaintiff only as "Physician A."

At the exit interview with hospital staff, the independent reviewers issued a preliminary report recommending that plaintiff undergo a six-month, intensive training program at the residency level before he be allowed to continue the practice of medicine. On March 4, 1999, based on the reviewers' preliminary report given at the exit interview, the Executive Committee recommended suspension of plaintiff's privileges pending his completion of a six-month remedial course in obstetrics/gynecology in a program approved by the Executive Committee. Plaintiff had thirty days to apply for such a program. Failure to comply with these conditions would result in termination of his privileges.

The next day, March 5, 1999, plaintiff filed a complaint alleging discrimination on the basis of race, antitrust violations and state law tort and contract claims. Plaintiff also moved for a preliminary injunction to lift the suspension, which was granted in part by the district court with instructions to defendants to institute monitoring procedures for plaintiff instead of suspending his privileges. Specifically, the complaint alleges (1) violations of 42 U.S.C. § 1981 based on defendants' interference with Samuel's business contracts and expectancies based on race (Count I), (2) that defendants acted in concert to revoke his staff privileges and eliminate OB/GYN competition within Lenawee County in violation of the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.* (Count II),

breached its contract with him and he is not asking for a specific review of whether the hospital followed its own procedures in suspending him, he is actually seeking judicial intervention into the decision of a private hospital to suspend his staff privileges. A decision of this nature is not proper matter for judicial intervention and consideration of his claim would make a "mockery of the rule that prohibits judicial review of such decisions by private hospitals." *Id.* at 794, 440 N.W.2d at 83.

The judicial reviewability of medical staffing decisions has been debated and continues to be debated in most states. Most physicians are not employed by a hospital but instead are independent contractors who are granted privileges to use a hospital, including its staff and equipment. A hospital's procedures for granting or renewing privileges and the standards by which a doctor must abide are generally embodied in the hospital's bylaws.

Most jurisdictions distinguish between private and public hospitals, with the staffing decisions of public hospitals subject to the due process and equal protections guarantees under the United States Constitution and the staffing decisions of private hospitals generally unreviewable or subject to very limited judicial review.[1] In addition, the level of judicial review may differ between decisions to grant privileges as an initial matter and decisions to limit or suspend existing privileges.

The rule generally forbidding judicial review of staffing decisions by private hospitals appears to be the majority view in the United States, although some jurisdictions allow limited judicial review to ensure only that the hospital followed its own procedures. *See, e.g., Owens v. New Britain*

---

[1]Florida has eliminated the distinction between private and public hospitals for purposes of judicial reviewability by legislating that a hospital must promulgate bylaws and those bylaws create a binding contract between the physician and the hospital.

alleged, plaintiff is complaining of nothing more than a decrease or potential decrease in patients from competition. Based on the facts in the record at this time, we do not see a likelihood on the merits of the antitrust claim.

### 3.  *Tortious Interference with Contractual Relations and Business Relationships Claim*

As to the tortious interference claim, the claim on which the district court found the most chance of success by plaintiff, Michigan law is very clear that claims arising from the peer review process are not judicially reviewable. The district court therefore did not have jurisdiction to review this claim. Under Michigan law, a private hospital is empowered to appoint and remove its members at will without judicial intervention and has the right to exclude any doctor from practicing therein. *Muzquiz v. W.A. Foote Mem. Hosp., Inc.*, 70 F.3d 422, 430 (6th Cir. 1995); *Long v. Chelsea Community Hosp.*, 219 Mich. App. 578, 586, 557 N.W.2d 157, 161 (1996); *Sarin v. Samaritan Health Center*, 176 Mich. App. 790, 795, 440 N.W.2d 80 (1989); *Veldhus v. Central Mich. Community Hosp.*, 142 Mich. App. 243, 246, 369 N.W.2d 478, 479-80 (1985); *Hoffman v. Garden City Hosp.-Osteopathic*, 115 Mich. App. 773, 778-79, 321 N.W.2d 810 (1982).

The only exception to this nonreviewability rule arises when defendants have been accused of violating state or federal law, such as state or federal discrimination laws. The district court was free to review the federal antitrust and discrimination claims, as we did above, but it was without jurisdiction to review plaintiff's claim of tortious interference with contractual relations and business relationships, as are we, because it would necessarily involve a review of the decision to suspend plaintiff and the methods or reasons behind that action, which is clearly prohibited under Michigan law as improper interference with the hospital's decisions and the peer review process. *See Sarin* at 791-92, 440 N.W.2d at 80. Although plaintiff does not allege that the hospital

(3) a state law claim of tortious interference with business expectancy and relationships (Count III), (4) existence of a civil conspiracy among defendants to (a) unreasonably restrain plaintiff from practicing medicine, (b) interfere with contracts with patients and (c) discriminate based on race (Count IV), (5) defamation regarding statements about plaintiff's ability to practice medicine and his mental health (Count V), (6) a violation of the due process rights of reasonable notice and a hearing prior to the deprivation of his property interest to practice medicine (Count VI).

After a hearing held March 8, the district court granted the preliminary injunction in part and ordered continuation of the monitoring process. On March 15, defendants filed a motion for dismissal of the complaint or summary judgment. At a hearing held March 16, the district court ordered continuation of the monitoring process.

On April 14, 1999, the court dismissed the defamation (Count V) and due process (Count VI) claims pursuant to Rule 12(b)(6), but refused to dismiss the other claims or to grant defendants' motion for summary judgment, noting that it believed the state law claim for tortious interference to be the strongest claim. In a separate order issued the same day, the district court granted the preliminary injunction in part, because (1) it found that plaintiff had some possibility of succeeding on the merits with regards to his tortious interference with business expectations claim and (2) it found that plaintiff would be irreparably injured in his medical career by the suspension. The district court ordered that the monitoring remain in place to ensure the safety of the community. On April 26, 1999, the district court denied a stay of the injunction pending appeal. At a May 3 status conference, the district court approved the monitoring plan proposed by plaintiff, which called for plaintiff to confer telephonically with several doctors in other hospitals on each admission. Defendants did not offer any counterproposal regarding monitoring and maintained that *any* monitoring was

unsatisfactory and unethical in light of the magnitude of plaintiff's alleged deficiencies.

Defendants appealed the denial of the stay of the injunction pending appeal and filed an interlocutory appeal of the denial of their summary judgment motion. This Court stayed enforcement of the injunction, thereby reimposing the suspension of plaintiff's staff privileges at the hospital, but also set the appeal on an expedited basis.

## II.

When ruling on a motion for preliminary injunction, the district court considers four factors: (1) whether the movant is likely to prevail on the merits; (2) whether the movant would suffer irreparable injury if the court does not grant the injunction; (3) whether a preliminary injunction would cause substantial harm to others and (4) whether a preliminary injunction would be in the public interest. *Glover v. Johnson*, 855 F.2d 277, 282 (6th Cir. 1988). We review the district court's determination under an abuse of discretion of standard. *Id.*

### Likelihood of Success on the Merits

We agree with the district court that there is minimal evidence in the record to demonstrate a *likelihood* of success on the merits of plaintiff's claims. Order Granting Preliminary Injunction at 13 n.2 ("Plaintiff has not argued, at least not with any serious conviction, that any of his other claims [other than the tortious interference claim] are likely to succeed on the merits."). The facts alleged in the complaint are barely adequate to survive a motion to dismiss on the federal discrimination and antitrust claims, although after more discovery it may be possible for plaintiff to adduce further evidence on these claims.

### 1. *Racial Discrimination*

Plaintiff alleges that Herrick Memorial discriminated against him based on race in violation of 42 U.S.C. § 1981. However, no specific examples relating to discrimination against him are recited in his complaint. Plaintiff recites facts concerning possible racial discrimination by Herrick Memorial against a third party who applied for a job at the hospital, but offers neither actual nor circumstantial evidence regarding conduct against him. The only factual allegations cited to support his claim are that the hospital hired Dr. Sammarco, who is white, and his bare allegation that he was reviewed and suspended after a patient death while nonminority doctors were treated differently under similar circumstances. Based on these factual allegations, we do not see a likelihood of success on the merits.

### 2. *Antitrust Claim*

As to the antitrust claim, plaintiff contends that the hospital wishes to drive him out of business because it would derive greater revenue from patients seeing Dr. Sammarco, who is a staff physician, instead of plaintiff, who in private practice and has hospital privileges. In other words, the hospital first hired Dr. Sammarco and then used the peer review process improperly to restrain access to the market for obstetric and gynecological services. First, at least the individual defendants may be immune from antitrust liability for a properly conducted peer review process. The Health Care Quality improvement Act of 1986, 42 U.S.C. §§ 11101 *et seq.*, provides antitrust immunity for participants in properly conducted peer review processes. *Id.* § 11111; *see also Lie v. St. Joseph Hosp. of Mt. Clemens, Mich.*, 964 F.2d 567, 570 (6th Cir. 1992). Second, plaintiff has related virtually no facts that demonstrate that there was any anticompetitive motive behind the hiring of Dr. Sammarco or plaintiff's suspension. The allegations are based only on speculation of the motivation behind these actions. Absent the assumptions about the motives behind the conduct that plaintiff has