NITA KATHERINE BABCOCK, APPELLANT, V. SAINT FRANCIS MEDICAL CENTER, A NONPROFIT CORPORATION, AND THE MEDICAL STAFF OF SAINT FRANCIS MEDICAL CENTER, GRAND ISLAND, NEBRASKA, APPELLEES.

543 N.W.2d 749

Filed February 20, 1996.   No. A-94-619.

Judy K. Hoffman and James H. Truell for appellant.

Patrick G. Vipond and James W. Ambrose II, of Kennedy, Holland, DeLacy & Svoboda, for appellees.

HANNON, SIEVERS, and INBODY, Judges.

SIEVERS, Judge.

Dr. Nita Katherine Babcock appeals the district court order granting summary judgment to Saint Francis Medical Center and the medical staff of Saint Francis, hereinafter collectively referred to as St. Francis or the hospital for convenience. Babcock's medical staff privileges as an anesthesiologist were suspended by St. Francis after concerns arose about Babcock's drinking. Babcock filed suit against St. Francis, asking for injunctive relief, reinstatement of her staff privileges, and damages. St. Francis moved for summary judgment, which was granted, and Babcock now appeals.

## STATEMENT OF FACTS

Babcock applied for staff privileges with St. Francis as an anesthesiologist. St. Francis' bylaws provide that all practitioners who apply for medical staff privileges shall be provided with an application, a copy of the bylaws, and rules and regulations pertaining to the staff. Under the bylaws, the application form is to include an acknowledgment and agreement that the applicant has received and read the bylaws and agrees to be bound by them.

The record does not contain a complete application form filled out by Babcock. Instead, it contains two pages from the application. On one page of the application form, Babcock acknowledged that she has had a "physical or mental health condition (to include, but not limited to, drug or alcohol abuse) that affects or is reasonably likely to affect your ability to perform professional or medical staff duties." The second page from the application in the record is an attachment made by Babcock in which she states, in further explanation of her admission to her physical or mental health condition:

> In February of 1992, I was an inpatient at Hazelden Treatment Center for alcoholism for 30 days. Following inpatient treatment, I have continued outpatient counselling and frequently and regularly attend AA. . . . Since inpatient treatment I have not taken a sick day or vacation day, and have assumed regular call schedules and full-time physician duties.

The bylaws of the hospital state that the executive committee of the medical staff is empowered to review applications and

make recommendations, including any special conditions to be attached to the offer of medical staff privileges, to the hospital board. The hospital board then makes a decision whether to adopt the recommendation of the executive committee. The bylaws provide that all initial appointments to the medical staff are provisional and for 1 year. The provisional appointees are supervised and observed by other members of the St. Francis medical staff during the provisional period.

Babcock's application for staff privileges led to an agreement dated July 12, 1993, made between Babcock and the hospital, in which she was required to meet certain conditions to be retained as a medical staff member with clinical privileges. The conditions include participation in aftercare to follow up on her inpatient treatment for alcoholism, verification of her aftercare participation, and random drug screenings. The agreement states that "[i]f at any time in the future, as a result of ongoing monitoring activities, it is deemed that the practitioner is not appropriately carrying responsibilities as a member of the medical staff, the practitioner may be subject to suspension or revocation of privileges."

Eleven days after the date of this agreement, a registered nurse and a fellow physician each reported smelling alcohol on Babcock's breath in the surgical preoperating room. The physician reported that "[h]er subsequent actions seemed to be uncoordinated." An ad hoc committee met with Babcock to notify her of the complaints against her and to allow her to take "appropriate action to resolve the concerns." As a result of this incident and executive committee action concerning the incident, Babcock then voluntarily took a leave of absence and was admitted to St. Francis' own inpatient alcoholism treatment program.

Upon her return to work, on September 7, 1993, Babcock and St. Francis entered into a second agreement which was substantially identical to the first agreement, save for the following provision: "If at any time in the future, as a result of ongoing monitoring activities *or in the event of recurrence*, it is deemed that the practitioner is not appropriately carrying responsibilities as a member of the medical staff, the practi-

tioner will be subject to termination of privileges." (Emphasis supplied.)

One month later, Babcock was arrested for second-offense driving while intoxicated in York County. Accompanying Babcock in the car on October 7, 1993, was her 5-year-old son. Babcock was tested for blood alcohol content (BAC) upon her arrest and had a BAC of .25. Babcock was scheduled to provide anesthesia for a surgery at 7:30 a.m. on October 8, but did not show up, since she was in jail. An affidavit in the record of Dr. Henry Nipper, an expert with respect to blood alcohol, states that at 7:30 a.m. on October 8, Babcock would have had a BAC of .09, given her BAC of .25 at the time she was tested when arrested. Because she did not show up for surgery, the hospital arranged to have anesthesia provided by a nurse anesthetist. Babcock called St. Francis at 1:30 p.m. on October 8, stating that she had been involved in an automobile accident and was in Omaha "getting checked up." However, the hospital quickly became aware of the true situation in York County.

On October 14, 1993, Dr. D.G. Wirth, president of the medical staff, notified Babcock that her privileges were temporarily suspended pending resolution of the criminal charge of driving while intoxicated. Under the hospital's bylaws, the president of the medical staff has the authority "whenever action must be taken immediately in the best interest of patient care in the hospital, to summarily suspend all or any portion of the clinical privileges of a practitioner." The bylaws provide that the practitioner may then request that a hearing before the executive committee of the medical staff be held to review the suspension in accordance with the "Hearing and Appellate Review Procedure" of the bylaws. On October 20, Babcock requested such a hearing, asking that it be held as soon as possible, but no later than 10 days. Babcock was notified on October 21 that a hearing had been set for October 27.

Under the hearing and appellate review procedure of the bylaws, the hearing before the executive committee must be recorded, the practitioner must be present, and neither the practitioner nor the hospital may be represented by counsel. However, the practitioner may be represented by a physician. The bylaws state that all participants shall be allowed a

reasonable opportunity to present relevant evidence, but that the rules of law relating to examination of witnesses and admission of evidence shall not be strictly followed. The practitioner has the right to call and examine witnesses, to introduce evidence, to cross-examine any witness, to challenge any witness, and to rebut any evidence.

The report from the executive committee hearing held on October 27, 1993, states that after the committee accepted documents into evidence regarding Babcock's application, the agreements earlier referred to herein, reports of alcohol on her breath, and the complaint charging her with second-offense driving while intoxicated, Babcock read a statement to the committee and asked Dr. B.D. Urbauer to speak on her behalf. Babcock was dismissed for an executive committee discussion. The report states that after Babcock was dismissed, Urbauer talked to the executive committee about Babcock's progress and treatment. Urbauer was then excused from the hearing. The report states that committee members expressed concern about patient care issues and the medical staff's responsibility for maintaining quality of patient care should Babcock be allowed to keep her privileges. The executive committee decided to recommend to the hospital board of directors that Babcock's suspension should continue pending resolution of the driving while intoxicated charge.

On November 3, 1993, Babcock was notified that the executive committee would recommend to the board of directors that her suspension should continue, pending the outcome of the criminal case. This notification also informed Babcock that she had a right to an appellate review of the executive committee's decision, by appeal to the governing body of the hospital, in accordance with the hearing and appellate review procedure of the bylaws. On November 12, Babcock requested appellate review. She was notified on November 23 that an appellate hearing had been set for November 29.

At the hearing before the appellate review committee, Babcock and St. Francis were represented by counsel. Babcock was allowed to make a statement. Under the bylaws, the appellate review hearing is to be based on the record from the executive committee hearing. However, Babcock was allowed to

enter into evidence a letter from a doctor which explains, she stated, the difference between a "relapse" and a "slip" in recovery from alcoholism. As a result of the appellate review committee hearing, the committee affirmed the executive committee's recommendation, but modified the recommendation so that the suspension would be permanent, rather than temporary and dependent upon the outcome of Babcock's criminal case. The recommendation was sent to the governing board, which in turn referred the matter to a joint conference committee. The bylaws provide that if the recommendations of the executive committee and the appellate review committee differ, the matter shall be referred to a joint conference committee for review and recommendation. In between the appellate review committee hearing and the joint conference committee review hearing, Babcock pleaded guilty to the charge of driving while intoxicated, second offense.

At the joint conference committee hearing on January 5, 1994, Babcock was represented by counsel, was allowed to introduce evidence and present witness testimony, and was allowed to cross-examine witnesses. At the conclusion of the hearing, the joint conference committee recommended that the board of directors terminate Babcock's privileges. The minutes from the board of directors meeting state that "[i]t was felt that the Medical Center cannot reasonably protect patients . . . short of terminating [Babcock's] staff membership and privileges." The board then voted to terminate Babcock's staff privileges. On January 28, St. Francis mailed a report for the National Practitioner Data Bank, pursuant to the requirements under the Health Care Quality Improvement Act, 42 U.S.C. § 11101 et seq. (1988 & Supp. V 1993) (the Act), notifying the data bank that Babcock's medical staff privileges had been terminated over concern about her drinking.

Babcock filed an amended petition in district court on February 8, 1994, against St. Francis, alleging that the actions of St. Francis were not supported by the evidence, were in violation of the hospital's own bylaws, and were not based on the conditions set forth in the September 7, 1993, agreement. Babcock requested an injunction to prevent St. Francis from notifying the National Practitioner Data Bank that her privileges

had been terminated and to prevent the enforcement of the suspension, a declaration that the suspension was contrary to the agreement and the bylaws, and an order reinstating her staff privileges as well as an award of damages for lost income. St. Francis filed a motion for summary judgment, which was granted by the district court.

## ASSIGNMENT OF ERROR

In this court, Babcock alleges that the district court erred when it granted St. Francis' motion for summary judgment.

## STANDARD OF REVIEW

To review a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *SID No. 57 v. City of Elkhorn*, 248 Neb. 486, 536 N.W.2d 56 (1995). A summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Id.*

An appellate court has an obligation to reach conclusions on questions of law independent of the trial court's ruling. *Jindra v. Clayton*, 247 Neb. 597, 529 N.W.2d 523 (1995).

## ANALYSIS

*Enjoin Report to National Practitioner Data Bank; Enjoin Suspension of Privileges.*

Babcock requested that the court enjoin St. Francis from filing a report with the National Practitioner Data Bank following disciplinary action taken against Babcock by St. Francis and that the court enjoin the hospital from suspending her privileges. Under the Act, and the rules and regulations promulgated pursuant to the Act, all licensed hospitals which take an action adversely affecting a practitioner's clinical privileges for more than 30 days are required to report such action to the state board of medical examiners, which in turn is required under the Act to report any information it receives

from such hospital to the National Practitioner Data Bank, as well as to report such information to the state licensing board. See, 42 U.S.C. §§ 11133 and 11134; 45 C.F.R. § 60.9 (1995). Both the hospital and the state board of medical examiners are subject to sanctions under the Act if they fail to comply with the Act's reporting requirements. §§ 11133 and 11134; 45 C.F.R. § 60.9.

■ Babcock's request for an injunction was made after St. Francis had already suspended her privileges and mailed the report required under § 11133. "The purpose of an injunction is the restraint of actions which have not yet been taken. Remedy by injunction is generally preventative, prohibitory, or protective, and equity will not usually issue an injunction when the act complained of has been committed and the injury has been done." *Koenig v. Southeast Community College*, 231 Neb. 923, 925, 438 N.W.2d 791, 794 (1989). Because the reporting to the National Practitioner Data Bank was already a fait accompli when Babcock requested the injunction, she was not entitled to this form of relief, and the district court correctly granted summary judgment on her requests for injunctive relief. See *Bamford v. Upper Republican Nat. Resources Dist.*, 245 Neb. 299, 512 N.W.2d 642 (1994) (holding that natural resources district order against farmers in fifth year of water allocation was moot by passage of time when fifth year was already over, but recognizing public interest exception to mootness doctrine, citing *Koenig v. Southeast Community College, supra*).

However, this is not to say that if Babcock's privileges were wrongfully suspended and reporting should not have occurred, a court could not fashion appropriate equitable relief. However, from an analytical standpoint, when the matter of the timing of the request for injunction is put aside, the district court could only err in not granting the injunction if St. Francis had wrongfully suspended Babcock's privileges. If St. Francis was entitled to summary judgment on the core issue of whether Babcock's privileges were properly suspended, then it logically follows that there could be no error in failing to grant the requested injunction. In addition to seeking to enjoin an act

which has already occurred, Babcock's appeal fails on this fundamental proposition, as will hereafter be fully detailed.

*Damages Against St. Francis.*

In her petition, Babcock sought damages against St. Francis for loss of income incurred as a result of the alleged breach of contract between Babcock and St. Francis. Because we find that the Act provides immunity from damages to St. Francis, Babcock is not entitled to any recovery for damages.

One of the purposes of the Act is to encourage physicians, without fear of litigation, to " 'identify and discipline other physicians who are incompetent or who engage in unprofessional behavior.' " *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318, 1321 (11th Cir. 1994). In furtherance of this purpose, the Act bestows limited immunity from lawsuits for money damages upon those who participate in professional peer reviews. 42 U.S.C. § 11111. The Act provides:

> If a professional review action . . . of a professional review body meets all the standards specified in section 11112(a) . . .
>
> (A) the professional review body,
>
> (B) any person acting as a member or staff to the body,
>
> (C) any person under a contract or other formal agreement with the body, and
>
> (D) any person who participates with or assists the body with respect to the action, shall not be liable in damages under any law of the United States or of any State (or political subdivision thereof) with respect to the action.

§ 11111.

The Act defines a "professional review body" as a health care entity, including hospitals, and any governing body or any committee of a hospital which determines physicians' privileges at such hospital. 42 U.S.C. § 11151(11). A "professional review action" is an action or recommendation which is based on the competence or professional conduct of an individual physician and which adversely affects or may affect such physician's clinical privileges. § 11151(9).

The standards which the "professional review body" must follow to enjoy immunity are set forth in 42 U.S.C. § 11112(a), as follows:

[A] professional review action must be taken—

(1) in the reasonable belief that the action was in the furtherance of quality health care,

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

■ Immunity under the Act is a question of law. *Bryan v. James E. Holmes Regional Medical Center, supra.* It was the intent of Congress that questions regarding immunity under the Act be resolved during the early stages of litigation, such as upon a motion for summary judgment. *Bryan v. James E. Holmes Regional Medical Center, supra.*

■ It is important to note, however, that the Act creates a rebuttable presumption that the professional review action "met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence." § 11112(a). This provision "creates a somewhat unusual standard: Might a reasonable jury, viewing the facts in the best light for [the disciplined physician] conclude that [the physician] has shown, by a preponderance of the evidence, that [the hospital's] actions are outside the scope of § 11112(a)?" *Austin v. McNamara*, 979 F.2d 728, 734 (9th Cir. 1992). "[T]he presumption language in HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable." *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d at 1333.

This doctrine from the Act is the functional and procedural equivalent to the well–established rule in Nebraska that after a movant for summary judgment has shown facts entitling the movant to judgment as a matter of law, the opposing party then has the burden to present *evidence* showing an issue of material fact which would prevent judgment as a matter of law for the

movant. *Wagner v. Pope*, 247 Neb. 951, 531 N.W.2d 234 (1995). See, also, *Keefe v. Glasford's Enter.*, 248 Neb. 64, 532 N.W.2d 626 (1995) (when movant for summary judgment makes prima facie case, burden of producing *evidence* shifts to party opposing motion). Thus, we review the record to determine whether Babcock has satisfied her burden of producing evidence (which under the Act means by a preponderance) which would allow a reasonable jury to conclude that St. Francis' actions failed to meet the four standards under the Act. Only if Babcock has met this burden of producing evidence can immunity be denied St. Francis and summary judgment foreclosed on the question of damages. Thus, we turn to the predicates for immunity under the Act.

First, a review of the record firmly establishes that the decision to terminate Babcock's privileges at St. Francis was made "in the reasonable belief that the action was in the furtherance of quality health care." § 11112(a)(1). Babcock had been reported as having alcohol on her breath in the preoperating room on one occasion, and on October 8, 1993, if she had shown up as scheduled to administer anesthesia, she would have been in no condition to work. The evidence shows that on October 8, if she had reported for work, she would have had a BAC level perilously close to exceeding the legal limit for a driver. It goes without saying that an anesthesiologist can be held to a higher standard than a driver. It seems obvious that the skill and delicacy required of an anesthesiologist demand, at minimum, complete sobriety. St. Francis should not have to wait until Babcock injures or kills someone before taking action. St. Francis had given Babcock a chance to recover after the first incident, and Babcock failed. The board's minutes stated that nothing short of terminating Babcock's privileges would adequately protect its patients. That St. Francis acted with a reasonable belief that it was furthering quality health care is clear. Babcock introduced no evidence to show any other motive or reason behind the action of St. Francis.

Second, the record establishes that St. Francis took its action "after a reasonable effort to obtain the facts of the matter." § 11112(a)(2). The issue of Babcock's termination was examined by no less than four different review panels at St. Francis.

Babcock was allowed to present evidence during three of these reviews, and each reviewing group based its decision upon the entire documentary record developed during consideration of Babcock's situation. In fact, by the time of the joint conference committee's decision, Babcock had admitted her guilt in the criminal proceeding for second-offense driving while intoxicated, arising from the October 7, 1993, incident. The second requirement for immunity is unquestionably satisfied.

Third, it is abundantly clear from the record that Babcock's staff privileges were revoked only "after adequate notice and hearing procedures [were] afforded to the physician involved or after such other procedures as [were] fair to the physician under the circumstances." § 11112(a)(3). While § 11112(b) provides the exact conditions a hospital must meet to qualify under § 11112(a)(3), the failure to meet the exact conditions does not, "per se, constitute a failure to meet the standards" of § 11112(a)(3) " '[i]f other [fair] procedures are followed.' " *Bryan v. James E. Holmes Regional Medical Center*, 33 F.2d 1318, 1336 (11th Cir. 1994). Moreover, the physician waives the requirement that the enumerated conditions under § 11112(b) be followed if the physician fails to object to the notice or hearing procedures. *Bryan v. James E. Holmes Regional Medical Center, supra.* The record establishes that during the peer review process Babcock never raised any objection on the ground of inadequate notice or faulty hearing procedure. She was fully notified of the various proceedings and participated in the hearings which were provided to her. It is also clear that the procedures used by St. Francis to decide to terminate Babcock's privileges, and to review that decision, were fundamentally fair.

Finally, the record clearly establishes that St. Francis decided to terminate Babcock's privileges "in the reasonable belief that the action was warranted by the facts known." § 11112(a)(4). The board terminated Babcock because she posed a possible danger to St. Francis' patients. The role of the courts in review of a hospital's actions under this subsection is not " 'to substitute our judgment for that of the hospital's governing board or to reweigh the evidence regarding the . . . termination of medical staff privileges.' " *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d at 1337 (quoting *Shahawy v. Harrison*, 875

F.2d 1529 (11th Cir. 1989)). We do not substitute our judgment for the hospital's, but hold that as a matter of law, under the facts disclosed by the record before it from the peer review process, St. Francis could hold a reasonable belief that suspension of Babcock's privileges was warranted.

In summary, we conclude that no reasonable jury could conclude, even viewing the facts most favorably to Babcock, that Babcock has produced evidence, rising to the level of a preponderance as the Act requires, that St. Francis' actions were outside the scope of § 11112(a). As a result, St. Francis is immune from any liability for damages under the Act, and therefore, the district court correctly granted summary judgment against Babcock on her claim for damages.

*Reinstatement of Staff Privileges; Declaration that Suspension Was Contrary to Contract and Hospital's Bylaws.*

Babcock alleges that St. Francis can terminate her privileges for breach of the September 7, 1993, agreement only and that because she did not breach that agreement, St. Francis cannot terminate her privileges. Babcock alleges that there are material issues of fact regarding whether she breached the agreement. Moreover, Babcock alleges that she was entitled to due process during the proceedings to terminate her privileges and that there are material issues of fact regarding whether she was denied due process by St. Francis.

A private hospital's actions do not constitute state action and therefore are not subject to scrutiny by the courts for compliance with due process protection. *Pariser v. Christian Health Care Systems, Inc.*, 816 F.2d 1248 (8th Cir. 1987); *Tunca v. Lutheran General Hosp.*, 844 F.2d 411 (7th Cir. 1988); *Modaber v. Culpeper Memorial Hospital, Inc.*, 674 F.2d 1023 (4th Cir. 1982); *Hodge v. Paoli Memorial Hospital*, 576 F.2d 563 (3d Cir. 1978); *Owens v. New Britain General Hosp.*, 229 Conn. 592, 643 A.2d 233 (1994); *Adkins v. Sarah Bush Lincoln Hea. Ctr.*, 129 Ill. 2d 497, 544 N.E.2d 733 (1989).

Babcock complains that she was not allowed to perform full discovery to determine whether the hospital received Hill–Burton funding and medicaid and medicare funds or whether it was regulated by the state, received tax–free bonds,

was exempt from taxes, and received tax–deductible contributions, all of which, she argues, would demonstrate that the hospital was a public or quasi–public entity and thus that its actions were state actions. However, all of these factors, even if proved, "are insufficient to establish state action, which exists 'only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.' " (Emphasis omitted.) *Pariser v. Christian Health Care Systems, Inc.*, 816 F.2d at 1252. See, also, *Modaber v. Culpeper Memorial Hospital, Inc., supra*. Here, Babcock has not alleged or otherwise identified a nexus between the various forms of alleged government involvement with the hospital and the hospital's decision to suspend Babcock's privileges. Therefore, even if Babcock had been able to perform additional discovery and establish that St. Francis was not a private hospital, such fact would not have established a causal connection between state action and the decision to suspend her privileges. See *Pariser v. Christian Health Care Systems, Inc., supra*. The causal nexus for Babcock's suspension is the furtherance of quality health care. Babcock has not carried her burden of proof to make out a genuine issue of material fact that the motive or reason behind her suspension was "state action" or something other than the furtherance of quality health care. However, even though the hospital's actions are not subject to a strict due process analysis, this is not to say that courts have not reviewed a hospital's actions concerning suspension of privileges to ensure some basic level of fairness.

Our research has revealed that only the Michigan courts have held that a private hospital's decision to exclude a physician from practicing at the hospital is not subject to any form of judicial review. In *Sarin v Samaritan Health Ctr*, 176 Mich. App. 790, 440 N.W.2d 80 (1989), the court refused to review a hospital's decision to terminate privileges, even when the physician alleged a failure by the hospital to follow its own bylaws. The court in *Sarin* said that to do so would "necessarily involve a review of the decision to terminate and the methods or reasons behind that decision, thus making a mockery of the rule that prohibits judicial review of such decisions by private hospitals." *Id*. at 794, 440 N.W.2d at 83.

However, the majority of the courts have held that the decision of a private hospital to revoke, suspend, or limit the privileges of a physician or other member of the medical staff is subject to limited judicial review to ensure that the hospital substantially complied with its medical staff bylaws, as well as to ensure that the bylaws provide for basic notice and fair hearing procedures. *Owens v. New Britain General Hosp.*, 229 Conn. 592, 643 A.2d 233 (1994); *Mahmoodian v. United Hosp. Center, Inc.*, 185 W. Va. 59, 404 S.E.2d 750 (1991) (citing cases from other jurisdictions); *Bouquett v. St. Elizabeth Corp.*, 43 Ohio St. 3d 50, 538 N.E.2d 113 (1989); *Adkins v. Sarah Bush Lincoln Hea. Ctr.*, 129 Ill. 2d 497, 544 N.E.2d 733 (1989); *Kiracofe v. Reid Memorial Hosp.*, 461 N.E.2d 1134 (Ind. App. 1984); *Garrow v. Elizabeth General Hospital and Dispensary*, 79 N.J. 549, 401 A.2d 533 (1979). Such a review "ensures procedural fairness to the physician while preserving decisions concerning staff privileges for the expert judgment of hospital officials." *Owens v. New Britain General Hosp.*, 229 Conn. at 608, 643 A.2d at 242.

A hospital's obligation to follow its own bylaws can stem from a contractual relationship between the hospital and physician. *Owens v. New Britain General Hosp., supra*; *Mahmoodian v. United Hosp. Center, Inc., supra*; *Berberian v. Lancaster Osteo. Hosp. Assn.*, 395 Pa. 257, 149 A.2d 456 (1959). Under St. Francis' bylaws, all physicians applying for staff privileges must agree to be bound by the hospital's bylaws. Thus, St. Francis and Babcock were not only bound by the conditional agreement, but by the bylaws.

Construction of a written contract is a question of law for the court. *International Harvester Credit Corp. v. Lech*, 231 Neb. 798, 438 N.W.2d 474 (1989). It is clear, from an examination of the bylaws, that St. Francis has the ability to offer conditional, provisional staff privileges to physicians who wish to join the medical staff at St. Francis. The agreement between Babcock and St. Francis stated certain conditions Babcock had to fulfill to be retained; however, the bylaws also require physicians to be able to continually demonstrate to the members of the medical staff that any patient who may be treated by the physician will receive quality care. The bylaws

also provide that whenever the activities or professional conduct of any physician is considered lower than the standards or aims of the medical staff, corrective action may be taken. St. Francis had the ability to terminate Babcock's staff privileges for breach of the agreement, breach of the bylaws, or both.

Our examination of the hospital's bylaws reveals a fundamentally fair procedure which affords the practitioner notice and the ability to have the charges reviewed by an impartial body, to which the physician has the ability to present evidence, and the physician is accorded the right to an appeal. Such provisions are sufficiently fair. *Adkins v. Sarah Bush Lincoln Hea. Ctr., supra.* The hallmarks of procedural due process are notice concerning the nature and subject of the proceeding, an opportunity to be heard and to present evidence, representation by counsel when required by statute or constitutional provisions, and a hearing before an impartial decisionmaker. See *State ex rel. Grape v. Zach*, 247 Neb. 29, 524 N.W.2d 788 (1994), and cases collected therein. Babcock received these fundamental protections from St. Francis. While Babcock argues that because the executive committee and the various appeal panels contained some of the same members, she was denied a fair and impartial hearing, we cannot agree. Absent evidence of actual bias, the fact that a board or committee or some of its members might have earlier considered suspending a physician's privileges does not amount to an unfair hearing. *Adkins v. Sarah Bush Lincoln Hea. Ctr., supra*; *Chessick v. Sherman Hospital Ass'n*, 190 Ill. App. 3d 889, 546 N.E.2d 1153 (1989). Babcock has failed to show any evidence of actual bias; therefore, under the bylaws, she was afforded a fair hearing.

To the extent that courts examine the evidentiary basis for a hospital's decision to suspend privileges, such examination is in recognition that an inherent element of fair hearing procedures is that there be sufficient evidence to support the hospital's decision. See *Mahmoodian v. United Hosp. Center, Inc.*, 185 W. Va. 59, 404 S.E.2d 750 (1991). The measure of evidence, irrespective of phraseology, according to the court in *Mahmoodian*, "appears to be either an arbitrary and capricious (or abuse of discretion) standard or a substantial evidence

standard." *Id.* at 71, 404 S.E.2d at 762. Nonetheless, *Mahmoodian* acknowledges that the decision of a hospital, whether private or public, concerning medical staff privileges is entitled to "judicial deference." *Id.* at 71, 404 S.E.2d at 762.

The Supreme Court of Connecticut in *Owens v. New Britain General Hosp.*, 229 Conn. 592, 643 A.2d 233 (1994), although citing the above holdings of *Mahmoodian* in a footnote, did not adopt a standard of review by courts on the measure of evidence necessary to support medical staffing decisions. Instead, the *Owens* court held:

> The exercise of their [hospital staff's and administration's] discretion should be subject only to limited judicial surveillance to determine if the hospital substantially complied with its applicable bylaw procedures. . . .
>
> . . . [W]e conclude that the substantial compliance test ensures procedural fairness to the physician while preserving decisions concerning staff privileges for the expert judgment of hospital officials.

229 Conn. at 606–08, 643 A.2d at 241–42. Thus, judicial review properly encompasses the subject of whether the hospital substantially complied with its bylaws, whether notice was provided, whether fair procedures were employed, and whether there was sufficient evidence behind the decision to suspend so that the decision cannot be said to be arbitrary and capricious.

In summary, the evidence establishes that Babcock came to St. Francis with a history of serious alcohol problems for which she had previously undergone inpatient treatment. Soon after Babcock began her employment with St. Francis, other staff noticed when they were preparing for surgery that she exhibited signs of having been drinking. In response to those complaints, she again underwent inpatient treatment, but within 30 days of the agreement for her return to work she was arrested for second-offense driving while intoxicated. In addition to her having a high BAC of .25 in the October 7, 1993, incident, her 5-year-old son was a passenger in the vehicle—reinforcing the conclusion that her addiction was serious and interfering with her judgment. There was evidence that had she reported for work the next morning, she would have been laboring under a BAC of .09—not quite too drunk to legally drive, but surely too

drunk to be in an operating room. Babcock did not dispute these basic facts, and during the review process she pleaded guilty to second–offense driving while intoxicated.

Given that an anesthesiologist literally has the life of surgical patients in her hands, the potential threat to patients from Babcock is obvious. She was not a fully recovered alcoholic, but a person still strongly in the grasp of alcohol. The hospital need not have waited for a patient's death or injury at her hands before acting, when faced with the evidence showing the hold alcohol had over her. Given the facts known to St. Francis and the potential for harm, the decision to suspend Babcock's staff privileges was not arbitrary or capricious. There is no genuine issue of material fact as to whether St. Francis substantially complied with its own bylaws when determining whether Babcock's staff privileges should be terminated; it did substantially comply. The district court correctly granted St. Francis' motion for summary judgment on all aspects of Babcock's claim.

AFFIRMED.