759 N.W.2d 484 (2009)
277 Neb. 5
REGENCY HOMES ASSOCIATION, a Nebraska not-for-profit corporation, Appellee,
v.
Jeffrey L. SCHRIER, Appellant.
No. S-07-903.
Supreme Court of Nebraska.
January 23, 2009.
*486 Robert W. Mullin and Andrew G. Davis, of Lieben, Whitted, Houghton, Slowiaczek & Cavanagh, P.C., L.L.O., Omaha, for appellant.
Bruce H. Brodkey and Jason C. Demman, of Brodkey, Cuddigan, Peebles & Belmont, L.L.P., and Stephen G. Olson II, of Engles, Ketcham, Olson & Keith, P.C., Omaha, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
McCORMACK, J.

NATURE OF CASE
Regency Homes Association (Association) sued Jeffrey L. Schrier after he replaced his roof in violation of a covenant prohibiting asphalt shingles. The covenant had been passed as an amendment 2 years before the roof replacement. The original covenants did not specify roofing materials, but subjected all alterations to approval by the Association's architectural control committee (Committee). The question in this case is whether a vote to pass the amendment by three-quarters of those voting, but only a minority of the total homeowners, was valid under bylaws stating covenants could be "extended, modified, or terminated ... by a three-quarters vote of the entire number of memberships of Regular Members present in person or by proxy." Also in issue is whether the roof covenant was invalid because it was outside the scope of what a homeowner could reasonably expect from an "extension, modification, or termination" of the original covenants.

BACKGROUND
In 1968, the Association adopted its original bylaws and filed a declaration setting forth covenants and easements for the properties governed by the Association. The Association's bylaws separated members into two classes, "regular" members and "special" members, Individuals had one "regular" membership vote for each lot or dwelling unit owned in the area, but could only have one "special" membership vote, regardless of the number of properties owned. A "quorum" was defined in the bylaws as "[s]uch members present in person or by proxy ... for any meeting of the Regular Members or for any meeting of any one or both membership classes."
The covenants were to run through December 31, 1998, and included the requirement that the dwellings be detached single-family homes not more than 2½ stories high, that they have enclosed garages with automatic doors, and that they follow specific driveway requirements and limitations on the location of recreational equipment. *487 In addition, the covenants prohibited exterior trash burners, undesirable vegetation, visible rubbish, livestock, and specified activities on the lots. The covenants did not set forth any other specific building requirements, but stated:
c. No single-family residence will be altered, built, constructed, or otherwise maintained on any lot without an express written Approval executed by Association through [the] Committee or [the Association's] permission by implied approval secured in the manner set out in its Articles of Incorporation or its By-Laws, as from time to time amended, as to general appearance, exterior color or colors, harmony of external design and location in relation to surroundings and topography and other relevant architectural factors.
The bylaws established the Committee and charged it with considering "preliminary plans, sketches, or specification or other provisional data for all buildings ... or modifications thereof." The bylaws further described that within 30 days of receipt of final plans and specifications, the Committee shall approve or disapprove the plans "as to harmony of external design and location in relation to surroundings, topography, and other relevant architectural factors of concern to the corporation."
The declaration stated that the "Association will have the right in the manner set out in its Articles of Incorporation or its By-Laws, as from time to time amended, at any time or from time to time to extend, modify, or terminate all or any part or parts of this Declaration." The bylaws provided:
[A]ll or any part [of the declaration] shall be extended, modified, or terminated only when no one person holds more than one-fourth of the entire number of memberships of Regular Members and upon recommendation of the Board of Directors accepted by a three-quarters vote of the entire number of memberships of Regular Members present in person or by proxy at any annual or special meeting or responsive to a vote thereon by mail.
In 1988, the Association extended the declaration through December 31, 2028. No other relevant amendments were made at that time. In 2002, at the annual meeting, the members voted on changes to the declarations and bylaws, after being notified of the specific changes proposed. Out of 481 members in the Association, only 137 participated in the vote, and the amendments were considered passed after 119 voted in favor and 18 voted against. During the time of both amendments, no one person held more than one-quarter of the entire number of memberships of regular members, and both amendments were made upon recommendation of the board of directors.
The amendments set forth more detailed building specifications, including the added requirement that all roofs be covered with wood shakes or wood shingles, tile, or slate. Asphalt and woodruff products were specifically prohibited. Improvements made prior to the adoption of the amended declarations were generally not required to conform to the amended provisions, "until such time as any replacement or repair or substantial construction is made." And as to roofs specifically, "[h]omes with non-conforming roofing material as of the effective date of these covenants must use conforming materials when replacement of said roof or repair of more than twenty-five percent (25%) of the roof surface occurs, unless approved by the Committee."
In 2004, Schrier's parents purchased a home in the subdivision governed by the Association. The purchase was made with *488 the expectation of selling it shortly thereafter to Schrier. Schrier contracted to have the roof replaced with asphalt shingles, and in 2005, he purchased the property. Schrier did not obtain permission from the Committee for the replacement. The Association eventually notified Schrier that the new roof materials were in violation of the covenants and demanded they be replaced with approved materials. When Schrier refused, the Association brought action for injunctive relief restraining Schrier from maintaining the roof and for an order mandating removal of the nonconforming materials. Schrier moved for summary judgment, and the Association moved for partial summary judgment. The trial court entered partial summary judgment in favor of the Association, and after Schrier removed his only remaining defense of estoppel, the court entered a final judgment against him.
In a memorandum opinion, the Nebraska Court of Appeals affirmed.[1] The Court of Appeals reasoned that the bylaws were clear that an amendment could be made simply by three-quarters of those members participating in the vote  as opposed to three-quarters of all members in the Association. The Court of Appeals also concluded that the roof requirement merely defined alterations to the property with more specificity than the original declarations and was not an attempt to enact restrictions of which Schrier would have had no notice. We granted further review.

ASSIGNMENTS OF ERROR
Schrier asserts that the Court of Appeals erred in determining (1) that a minority of members of a homeowners' association can modify, extend, or terminate declared restrictive covenants; (2) that an amended restrictive covenant that limits roof construction to wood shingles and that prohibits asphalt products is not a new covenant where the parties have stipulated that the prior original declarations did not limit or restrict roof construction or materials; and (3) that the proper interpretation of the bylaws of the Association is that the declaration containing restrictive covenants can be modified, extended, or terminated by a minority of the lot owners.

STANDARD OF REVIEW
A homeowner's action to determine the enforceability of a subdivision's restrictive covenants is equitable in nature.[2] In an appeal of an equitable action, an appellate court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, when credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.[3]

ANALYSIS
It is undisputed that Schrier's actions in replacing his roof with asphalt shingles were in clear violation of the plain language of the previously adopted roof covenant amendment. Schrier contends, however, that this amendment is invalid and unenforceable. We agree with the Court *489 of Appeals that the amendment was validly passed and does not violate law or public policy.
We first address whether the vote for the amendment complied with the bylaws. The parties dispute the meaning of "three-quarters vote of the entire number of memberships of Regular Members present in person or by proxy at any annual or special meeting or responsive to a vote thereon by mail." According to Schrier, this language is ambiguous and cannot, as a matter of law, be construed to mean that a minority of homeowners can amend the covenants. We disagree.
The management and internal affairs of a voluntary association are governed by its constitution and bylaws, which constitute a contract between the members of the association.[4] If the language of the organization's agreement is unambiguous, it shall be enforced according to its plain language.[5] The agreement is ambiguous if it is susceptible to two or more reasonable but conflicting interpretations or meanings.[6] The fact that the parties have suggested opposite meanings of the disputed instrument does not necessarily compel the conclusion that the instrument is ambiguous.[7]
In this case, while the provision refers to the "entire number of memberships," that phrase is clearly modified by "present in person or by proxy." Thus, the bylaws unambiguously allow amendment to the declaration by three-quarters of those voting, regardless of how many total homeowners choose to participate in the vote. Contrary to Schrier's assertion, we do not find that the use of the word "entire" adds any ambiguity to the overall meaning of the provision.
Nor do we find, as Schrier suggests, that homeowners cannot, as a matter of law, agree to a bylaw that could result in a minority of the homeowners' passing an amendment to the covenants. The Association is a nonprofit corporation governed by the Nebraska Nonprofit Corporation Act (the Act).[8] Section 21-1925(b) of the Act emphasizes that the corporation's bylaws "may contain any provision for regulating and managing the affairs of the corporation that is not inconsistent with law or the articles of incorporation." Nothing in the Act prohibits the bylaw provision in question in this case.
The Act provides that "[u]nless the ... Act, the articles, or the bylaws require a greater vote or voting by class, if a quorum is present, the affirmative vote of the votes represented and voting (which affirmative votes also constitute a majority of the required quorum) is the act of the members."[9] Unlike amendment of articles of incorporation[10] or bylaws,[11] under the Act, amendments to covenants or declarations do not require a greater vote. Section 21-1961(a) states: "Unless the ... *490 Act, the articles, or [the] bylaws provide for a higher or lower quorum, ten percent of the votes entitled to be cast on a matter must be represented ... to constitute a quorum...." (Emphasis supplied.) There is nothing in the Act that requires a minimum quorum for amendments to covenants or declarations.
Schrier's reliance on secondary sources such as the Restatement (Third) of Property[12] and American Jurisprudence[13] is misplaced. Those sources set forth default rules for homeowner agreements that either fail to provide for amendments or do so ambiguously. Thus the Restatement explains, "Unless the declaration specifies a different number, an amendment adopted by members holding two-thirds of the voting power is effective...."[14] While Schrier points out that the amendment provision in issue here is found in the bylaws and not the declaration, this is of no consequence. The comments to the Restatement indicate that the section upon which Schrier relies is designed to provide guidelines where no amendment powers are specified or for "interpretation" of expressly granted amendment powers.[15] As we have already explained, no such interpretation is necessary here.
In fact, Schrier's characterization of the Association bylaws as allowing "a minority"[16] to extend, modify, or terminate restrictive covenants is not accurate. Under the bylaws, as well as the Act,[17] all homeowners must be adequately notified of any proposed amendment and the manner in which the amendment would be voted on. If those homeowners all chose to participate in the vote, then no amendment could be passed by a minority. But when enough homeowners choose, after proper notification, not to participate in a vote on a proposed amendment, thereby leaving only a voting minority, it is hard to find any reason to invalidate a clearly written provision that would allow those participating to proceed with business.
We turn next to Schrier's argument that the roof amendment created a "new and different"[18] covenant that, under Boyles,[19] can only be passed unanimously. In Boyles, the original covenants involved the size of a residence and its garages, prohibited nuisances and temporary shelters, limited outbuildings and the type and number of animals, and required preapproval of construction plans. It also prohibited residential structures from being built "`on any building lot which is smaller in area than the original plotted number on which it is erected.'"[20] None of the provisions involved property setbacks. After an itemization of the covenant provisions, the covenants stated that "`[t]hese covenants... shall ... continue ... unless an instrument signed by a majority of the then owners ... to change same in whole or in part'" shall have been recorded.[21] Later, a majority of the lot owners added a covenant prohibiting the building of residences or other buildings within 120 feet of a country road that ran through the subdivision. *491 Because of the size and location of a particular lot, the setback provision made that lot unsuitable for building, and the owners sued to invalidate the new covenant.
On appeal, we agreed that the new setback provision was invalid. We acknowledged the general rule that "courts shall enforce changes to original covenants when such changes are permitted by the covenant agreement."[22] But, we explained that "[i]f a restrictive covenant agreement also contains a provision which provides for future alteration, the language employed determines the extent of that provision."[23] We emphasized that "[a]lthough we will enforce those restrictions of which a landowner has notice, we will not hold that a property owner is bound to that of which he does not have notice."[24]
We concluded that the specific language and context of the "change these covenants" provision did not authorize a mere majority of lot owners to bind all of the lot owners to "new and different covenants which restricted the use of the land."[25] We explained that there was thus nothing in the covenants which would have put the plaintiffs on notice that their land would one day be subject to a setback limit resulting in an inability to build on their lot. We did not say that under all circumstances, "new and different" covenants are invalid.
In this case, the declaration set forth that the members could "extend, modify, or terminate all or any part or parts of this Declaration." Therefore, the question is whether the roof covenant can be considered an "extension" or "modification" of the original covenants such that a homeowner in the Association would be on notice that his or her home could one day be subject to the roof amendment. Schrier points out that the parties stipulated that the original covenants did not specify roofing materials. But we note that the original covenants did describe that the Committee would have control over the "general appearance, exterior color or colors, harmony of external design and location in relation to surroundings and topography and other relevant architectural factors."
General powers of an architectural control committee must be exercised in a fair and reasonable manner,[26] and we do not determine specifically whether, as the Association contends, it could have prohibited Schrier from using asphalt shingles even under the old covenants. We do determine, however, that the original covenants' broad language contemplated control over general appearance, and general appearance would include roofing materials. A shake roof, for instance, has a different general appearance than an asphalt roof. Homeowners in the Association would have reasonably contemplated that an "extension" of the Committee covenant could later include a more specific description of roof materials acceptable for the homes in the subdivision. Accordingly, we hold that the amended roof covenant does not violate the principles set forth in Boyles.[27]

CONCLUSION
The roof amendment was passed in accordance with the Association's bylaws and *492 original declaration, and we find no reason to invalidate that amendment. Since it is undisputed that Schrier violated the amended roof covenant, we affirm the judgment of the Court of Appeals, which affirmed the trial court's judgment in favor of the Association.
AFFIRMED.
NOTES
[1] Regency Homes Assn. v. Schrier, No. A-07-903, 2008 WL 4960468 (Neb.App. July 7, 2008) (selected for posting to court Web site).
[2] See, Boyles v. Hausmann, 246 Neb. 181, 517 N.W.2d 610 (1994); Egan v. Catholic Bishop, 219 Neb. 365, 363 N.W.2d 380 (1985); 1733 Estates Assn. v. Randolph, 1 Neb.App. 1, 485 N.W.2d 339 (1992).
[3] Loontjer v. Robinson, 266 Neb. 902, 670 N.W.2d 301 (2003).
[4] Straub v. American Bowling Congress, 218 Neb. 241, 353 N.W.2d 11 (1984). See, also, Beaver Lake Assn. v. Beaver Lake Corp., 200 Neb. 685, 264 N.W.2d 871 (1978).
[5] See, e.g., Latenser v. Intercessors of the Lamb, Inc., 250 Neb. 789, 553 N.W.2d 458 (1996); Babcock v. Saint Francis Med. Ctr., 4 Neb.App. 362, 543 N.W.2d 749 (1996). See, also, e.g., Turner v. Hi-Country Homeowners Ass'n, 910 P.2d 1223 (Utah 1996).
[6] See Boyles v. Hausmann, supra note 2.
[7] Id.
[8] Neb.Rev.Stat. §§ 21-1901 to 21-19,177 (Reissue 2007).
[9] § 21-1962(a) (emphasis supplied).
[10] § 21-19,107.
[11] § 21-19,114.
[12] Restatement (Third) of Property: Servitudes § 6.10 (2000).
[13] 20 Am.Jur.2d Covenants §§ 225 and 226 (2005).
[14] Restatement, supra note 12, § 6.10(b) at 195 (emphasis supplied).
[15] Id., comment a. at 196.
[16] Brief for appellant at 13.
[17] § 21-1955.
[18] Brief for appellant at 22.
[19] Boyles v. Hausmann, supra note 2.
[20] Id. at 191, 517 N.W.2d at 617.
[21] Id. at 183, 517 N.W.2d at 613.
[22] Id. at 190, 517 N.W.2d at 617.
[23] Id. at 189, 517 N.W.2d at 616.
[24] Id. at 191, 517 N.W.2d at 617.
[25] Id. at 192, 517 N.W.2d at 618.
[26] See Normandy Square Assn. v. Ells, 213 Neb. 60, 327 N.W.2d 101 (1982).
[27] Boyles v. Hausmann, supra note 2.